UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BONITA   B.   PHILLIPS   and
JEFFREY S. PHILLIPS,

　　　　　Plaintiffs,

v.                              Case No: 2:13-cv-410-FtM-29MRM

EPIC   AVIATION,   LLC,   an
Oregon corporation,

　　　　　Defendant.

_____

## OPINION AND ORDER

This matter came before the Court on December 15 through 18, 2015, for a bench trial of plaintiffs' Third Amended Complaint (Doc. #58). The Court heard testimony from plaintiffs Bonita B. Phillips and Jeffrey S. Phillips; James E. Green, Jr., the Chief Financial Officer (CFO) and Senior Vice President of defendant Epic Aviation, LLC; Marsha Griffin Rydberg and David Boyette, two expert witnesses; real estate attorneys Douglas A. Wood and Gary K. Wilson; real estate agents Karen Van Arsdale and Susan M. Weidlich; real estate appraiser Hallas Neal Scott; and United States Trustee Diane Jensen (Trustee or the Trustee). (Docs. ## 141-144.) Various exhibits were admitted as evidence, and the Court took judicial notice of certain bankruptcy and district court

cases.  (Docs. ## 103, 109.)[1]  Both sides filed trial briefs (Docs. ## 139, 140), and defendant filed a Post-trial Memorandum (Doc. #154).  The Court heard closing arguments from counsel on January 15, 2016.  (Doc. #155.)

Pursuant to the Revised Joint Pre-Trial Statement (Doc. #138, ¶ 2), plaintiffs have withdrawn the quiet title claim in Count II because the real property at issue was sold on November 2, 2015. Plaintiffs confirmed at the beginning of the bench trial that this count was to be dismissed with prejudice, and defendant concurred. Accordingly, Count II is dismissed with prejudice.

The remaining claim, Count I of the Third Amended Complaint (Doc. #58), is an action for slander of title based upon the wrongful filing of a lis pendens and two notices of appeal in the Official Records of Collier County, Florida.  (Doc. #58, ¶¶ 51, 55.)  Plaintiffs assert that the Official Records filings were intentional and wrongful; that these documents published and communicated to third parties false assertions that Epic Aviation had some interest or rights in plaintiffs' primary residence (the Property) when it never had any such interest or right (id. at ¶

---

[1]The Court has caused certain documents from the related and judicially noticed bankruptcy and district court cases, which are cited or were reviewed but were not otherwise admitted as a separate exhibit by plaintiffs or defendant, to be filed in this case.  These are referred to as Court's Exhibits A through Y.

54); that the filed documents impaired the vendibility of the Property, and the false statements contained in the lis pendens played a material and substantial part in inducing others not to deal with plaintiffs (id. at ¶ 56); that the filed documents thwarted plaintiffs' ability to close the sale of the Property under written contracts, and have further thwarted their diligent attempts to re-contract the Property since January, 2013 (id. at ¶ 57); that Epic Aviation had actual knowledge of the wrongfulness of its conduct and the high probability that injury or damage to plaintiffs would result, but intentionally pursued its course of conduct, resulting in injury or damage (id. at ¶ 58); that Epic Aviation knew or should have known that the publication of the falsehoods would likely result in inducing others not to deal with plaintiffs (id.); that plaintiffs have been damaged by defendant's conduct and are entitled to compensatory damages, consequential damages, punitive damages, and attorney fees (id. at ¶ 59); and that these damages were proximately caused as a result of the published falsehoods (id.).

Along with key factual denials, Epic Aviation raised four affirmative defenses: (1) the slander of title claim is barred by the Florida litigation privilege; (2) plaintiffs have waived the slander of title claim; (3) plaintiffs had elected a different

remedy; and (4) the slander of title claim is barred by the Florida appellate litigation privilege.  (Doc. #68, pp. 8-9.)

The Court makes the findings of fact and conclusions of law set forth below.

## I.   *Findings of Fact*

### A. State of Oregon Judgment Against Jeffrey Scott Phillips

In 2004, Epic Aviation, LLC (Epic Aviation) sued Jeffrey Scott Phillips (Scott Phillips or Mr. Phillips) individually in Oregon state court based upon a guarantee he had signed relating to the purchase of aviation fuel.  The Oregon state court granted Epic Aviation's Motion for Summary Judgment on June 24, 2004, and a General Judgment and Money Award were filed on July 26, 2004, awarding Epic Aviation the principal amount of $322,603.30, plus late charges until fully paid.  Plaintiffs' Exhibit 1.  On September 24, 2004, Epic Aviation domesticated the Oregon state judgment in Florida by filing a copy of the judgment in the Official Records of Collier County, Florida, along with a certification and an affidavit.  Id.  See Florida Enforcement of Foreign Judgments Act, Fla. Stat. §§ 55.501-55.509.  Bonita B. Phillips (Bonnie Phillips or Mrs. Phillips), Scott Phillips' wife, was not a party to the Oregon lawsuit or the resulting Judgment. Epic Aviation's CFO testified at trial that Mr. Phillips has never paid anything on this judgment, and that Epic Aviation has expended

well in excess of $100,000 in attorney fees on Mr. Phillips'
litigation file.

There is no assertion by plaintiffs that the recording of
this money judgment as part of the enforcement process was wrongful
or constituted a slander of title to any of their property.  The
recording of the money judgment in this context was clearly
privileged, and indeed required by statute.

**B. Purchase of Green Dolphin Lane Property**

On February 28, 2005, Mr. and Mrs. Phillips (collectively
plaintiffs or Debtors) purchased a primary residence on .68 acres
of land located at 3060 Green Dolphin Lane, Naples Florida (the
Property) for approximately $6 million.  Plaintiffs' Exhibit 28,
Exh. A; Defendant's Exhibit 91, p. 9.  Plaintiffs' financing
included a first mortgage of $1.175 million and a second mortgage
of $500,000 on the Property.  Defendant's Exhibit 91, pp. 10-11.
Debtors proceeded to spend a little over $1 million on renovations
to the Property.  Id. at p. 9.  Plaintiffs owned the Property as
tenants by the entireties from its purchase until it was sold on
November 2, 2015.  (Doc. #138, ¶ 9(1).)  Because of its ownership
by the entireties, Epic Aviation's domesticated Oregon money
judgment against Mr. Phillips never attached to the Property.

### C. Chapter 7 Bankruptcy Proceedings, 2007 to Early 2012

On October 18, 2006, Bonnie Phillips filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code in the Fort Myers Division of the Middle District of Florida.  Court's Exhibit A; Case No. 9:06-bk-05685-FMD.  Epic Aviation was not a creditor of Mrs. Phillips, and did not file a Proof of Claim in her bankruptcy case.

On December 29, 2006, Scott Phillips filed his own Chapter 7 Voluntary Petition in the Fort Myers Division of the Middle District of Florida.  Court's Exhibit B; Case No. 9:06-bk-07489-FMD; Defendant's Exhibit 127, p. 2.  Epic Aviation filed a Proof of Claim based upon the domesticated Oregon money judgment, Defendant's Exhibit 127, p. 3, which constituted about 7% of the claims against Mr. Phillips. Plaintiffs' Exhibit 39, p. 4.  According to Epic Aviation's CFO's trial testimony, Epic Aviation is a company with approximately 95 employees and sales of over $500 million in the previous year.

The bankruptcy cases were jointly administered, but not consolidated, in Bankruptcy Court (Doc. #138, ¶ 9(3)), and the same Trustee, Diane Jensen, was appointed in both cases. According to the Trustee, Debtors claimed about $1 million owed to joint creditors, and each claimed a homestead exemption for the

Property and exemption for property owned by the entireties. Court's Exhibits A, B.

**(1) Trustee's Objections to Exemptions**

On March 7, 2007, the Trustee filed Objections to Exemptions as to Mrs. Phillips. Plaintiffs' Exhibit 28, Exh. A. As to the claimed homestead exemption, the Trustee objected that the acreage exceeded the Florida constitutional limit of .5 acres; that the exemption amount must be reduced by those improvements made within ten years and with intent to hinder, delay or defraud creditors; that the exemption was limited to $125,000 because the Property was purchased within 1,215 days of the filing of the bankruptcy petition; and that Debtor could not claim the benefits of 11 U.S.C. § 522(p)(2)(B) for various reasons relating to the sources of the funds used to purchase the Property. <u>Id.</u> The Trustee also objected to any property claimed to be exempt as property owned by the entireties, including the primary residence, but this objection only related to joint debts. <u>Id.</u> The Trustee testified at trial that a trustee may only reach a tenancy by entireties property to the extent the Debtors' obligations are owed to joint creditors.

On April 16, 2007, the Trustee filed similar objections to the claimed exemptions of Mr. Phillips. Defendant's Exhibit 186, ¶ 6; Court's Exhibit C.

**(2)  2007 Mediated Settlement Agreement**

In May 2007, the Trustee sought and was granted permission from the Bankruptcy Court to mediate her objections with the Debtors.  Court's Exhibit D.  A two-page Mediated Settlement Agreement between the Trustee and Debtors dated May 14, 2007 (the Settlement Agreement), Defendant's Exhibit 69, resolved "all matters and disputes between" the Trustee and the Debtors, including the Trustee's prior objections to Debtors' claimed exemptions.  The relevant terms and conditions were:  (1) the Trustee would be paid $825,000 from the sale of Debtors' home at 3060 Green Dolphin Lane, Naples, Florida; (2) upon payment, the Trustee and the Debtors would exchange mutual general releases; (3) the Property would "be put on the market promptly and the Debtors will keep the Trustee advised of the status of the sale and of any offers received;" (4) the Trustee would be given a lien on the Property, subordinate to two mortgages and real estate taxes, and was given permission to file the Bankruptcy Court's approval order in the public records; (5) the intentional failure of Debtors to pay the Trustee the $825,000 would constitute a breach of the Settlement Agreement, which "shall be grounds for revocation of the Debtors' discharge;" and (6) the Trustee's lien

on the Property was the property of the estate and protected by the automatic stay until paid in full.  Id.

The Settlement Agreement did not provide any deadlines for the sale of the Property or the payment of the money to the Trustee, and did not set a price at which the Property would be offered for sale.  Epic Aviation was not a party to the Settlement Agreement and did not participate in its negotiation, although it was consulted by the Trustee as to one alternative provision of the Settlement Agreement.

The Trustee testified at trial that if Debtors breached the Settlement Agreement, the Trustee's best case recovery would be to seek the $825,000 and to seek denial of the bankruptcy discharge of Debtors, or perhaps to seek enforcement of the Trustee's objections to the claimed exemptions.  In either event, there was no way the Trustee or any other creditor could reach tenancy by entireties property to satisfy the Epic Aviation domesticated money judgment.  Even if the Property was not exempt under the bankruptcy provisions, and Debtors were denied a bankruptcy discharge, the Property was still tenancy by entireties property which could not be reached by a creditor of only one of its two owners.

On May 24, 2007, the Debtors and the Trustee filed a Joint Motion for Authority to Compromise Controversies Between Diane

Jensen, The Chapter 7 Trustee, and Bonita and Jeffrey Phillips. Defendant's Exhibit 91, pp. 11-12; Defendant's Exhibit 178; Defendant's Exhibit 186, ¶ 10.  This joint motion summarized the terms of the Settlement Agreement and explained why the compromise settlement was in the best interests of the parties.

On June 18, 2007, Epic Aviation filed an Objection to the Joint Motion for Authority to Compromise Controversies.  Court's Exhibit E.  Epic Aviation asserted that the value of the Property may have been understated in the Joint Motion.  Id.

At a September 5, 2007 hearing, the Trustee and Debtors' bankruptcy counsel[2] told the Bankruptcy Court that there was no time limit on the sale of the home because the real estate market was bad.  Court's Exhibit F, p. 5.  The parties also told the Bankruptcy Court that the asking price would be $6 million, although they did not anticipate actually getting that much.  Id., pp. 5-6.  Epic Aviation withdrew its Objection to the joint motion to compromise at the hearing.  Plaintiffs' Exhibit 2, p. 1.

On October 9, 2007, the Bankruptcy Court issued an Order Approving Joint Motion for Authority to Compromise Controversies Between Diane Jensen, The Chapter 7 Trustee and Bonita and Jeffrey

---

[2]References to "Debtors' bankruptcy counsel" and like phrases refer to attorney Michael Markham and the lawyers, paralegals, and employees in his law firm.

Phillips. Plaintiffs' Exhibit 2; Defendant's Exhibit 178 (the Settlement Agreement Approval Order). In relevant part, the Settlement Agreement Approval Order granted the joint motion, approved the compromise Settlement Agreement, directed payment of $825,000 to the Trustee from the sale of the Property, and granted the Trustee a lien against the Property to secure Debtors' obligations under the Settlement Agreement, subordinate to two specified mortgages and any real estate taxes. Id. at ¶¶ 1-4. The Settlement Agreement Approval Order also authorized and directed the parties to take all steps necessary to effectuate and consummate the settlement, including that the Debtors "shall" place the home on the market for sale and continue to make the mortgage payments on the Property. Id. at ¶ 5. The Settlement Agreement Approval Order further provided that the intentional failure of Debtors to pay the Trustee the $825,000 "shall constitute a breach of the compromise and shall be grounds for the revocation of the Debtors' discharge." Id. at ¶ 7. Like the Settlement Agreement, the Settlement Agreement Approval Order did not set forth any restriction on the timing or price for the sale of the home. The validity of the Settlement Agreement and the Settlement Agreement Approval Order has never been challenged. As discussed below, however, on October 12, 2012, approximately five

years later, Epic Aviation would attempt to resurrect the Trustee's objections and assert them as its own.  Plaintiffs' Exhibit 28.

On October 25, 2007, the Trustee recorded a copy of the Settlement Agreement Approval Order in the Official Records of Collier County, Florida.  Plaintiffs' Exhibit 2.  This constituted public notice of the Trustee's lien on the Property and of the bankruptcy cases.  <u>Regions Bank v. DeLuca</u>, 97 So. 3d 879, 885 (Fla. 2d DCA 2012) (recording in Official Records constitutes notice of both the existence of the instrument recorded and its contents).

Mrs. Phillips obtained a discharge in her Chapter 7 bankruptcy case on November 7, 2007.  Court's Exhibit G; Defendant's Exhibit 127, p. 2.

### (3) Property Fails to Sell, 2007-2010; Epic Aviation Writes Off Judgment

As required by the Settlement Agreement, Debtors placed the Property on the market for sale, and kept it on the market during this relevant time period.  Defendant's Exhibit 69.  Debtors' initial listed asking price was $6.295 million.  Defendant's Exhibit 186, ¶ 11.  From 2007 to 2015, the Property was most often listed for sale with Karen Van Arsdale (Ms. Van Arsdale), a real estate broker with Premier Southby's in Naples, Florida.  For the

three years after the Settlement Agreement, the Property did not
sell.

In August 2009, Epic Aviation wrote off the balance of the
amount due from Jeffrey Phillips on its domesticated Oregon money
judgment.  Plaintiff's Exhibit 43A, p. 954.

On March 25, 2010, Debtors' bankruptcy counsel inquired of
the Trustee whether, in light of the downturn in the real estate
market and Debtors inability to sell the house, there was a
discounted cash number which would settle the matter.  Defendant's
Exhibit 121.  The Trustee responded she was not inclined to take
a discount, and suggested the Debtors lower the asking price, then
at $4.5 million, to $3 million.  Id.  The Trustee arrived at this
proposed price based upon informal information provided by Scott
Henderson, a Naples, Florida real estate agent she had used in the
past.  Defendant's Exhibit 117. Debtors declined to reduce the
price, and the Property remained on the market without being sold.
Ms. Van Arsdale testified that the various asking prices were set
at market price and were fair prices, and that she did everything
in her power to close contracts she obtained for Debtors.

On September 29, 2010, a frustrated Trustee filed the Chapter
7 Trustee's Motion to Compel Compliance with Settlement,
Defendant's Exhibit 186, seeking to compel Debtors to reduce the
asking price of the Property.  The Trustee argued that the

Settlement Agreement's requirement to place the Property on the market implicitly included the obligation of a realistic asking price. The Trustee conceded that the house had been on the market continuously, and that the original asking price of $6.295 million had been reduced to the current $4.5 million asking price. Defendant's Exhibit 186, ¶ 11. Despite these reductions, the Trustee asserted that Debtors "appear to be acting in bad faith in their attempts to market and sell the Home" because the asking price was significantly inflated. Id. at ¶ 16.

Later, on September 29, 2010, Debtors' bankruptcy counsel sent an email to the Trustee's counsel[3] noting the recent filing of the motion to enforce. Defendant's Exhibit 122. After some brief observations about the merits, Debtors' bankruptcy counsel offered $150,000 to settle the case. Id.

In an October 29, 2010, hearing before the bankruptcy judge, the Trustee admitted that she did not have sufficient information to determine if the asking price was inflated or achievable, Court's Exhibit H, p. 4, but requested an evidentiary hearing to determine whether Debtors were marketing the Property in good faith, id., p. 6. On November 14, 2010, the Bankruptcy Court

---

[3]References to "Trustee's counsel" or similar phrases refer to attorney Roberta A. Colton and the attorneys, paralegals, or employees in her law firm.

denied the motion without prejudice to the initiation by the Trustee of an adversary proceeding.  Defendant's Exhibit 187.  The Trustee did not file such an adversary proceeding because she questioned whether she could be successful.  The Property continued to be on the market at the $4.5 million asking price.

**(4)  Mr. Phillips Denied Bankruptcy Discharge**

In 2007, Epic Aviation filed a multi-count Complaint in an adversary proceeding objecting to Mr. Phillips' discharge.  See 9:07-ap-00181-ALP.  On August 10, 2009, after an evidentiary hearing, the Bankruptcy Court published a decision denying Mr. Phillips a Chapter 7 discharge under 11 U.S.C. § 727(a)(4)(A) for making false oaths in connection with the official schedules and statement of financial affairs in his bankruptcy case.  In re Phillips, 418 B.R. 445 (Bankr. M.D. Fla. 2009).  Final Judgment was entered the same day.  Defendant's Exhibit 126.

Mr. Phillips filed an appeal to the District Court.  The Bankruptcy Court's decision was affirmed by the undersigned in a March 29, 2011 Opinion and Order as to three of the five false oaths found by the Bankruptcy Court.  Defendant's Exhibit 127; In re Phillips, NO. 2:10-cv-212-FTM-29, 2011 WL 1196427 (M.D. Fla. Mar. 29, 2011).

While Mr. Phillips' appeal to the Eleventh Circuit Court of Appeals was pending, an exchange of emails occurred between

September 16 and 19, 2011, discussing compromise of the Settlement Agreement.   Defendant's Exhibit 70.   The Trustee offered to compromise the Settlement Agreement for $650,000, the Debtors countered at $400,000, and the Trustee stood firm at $650,000. Id.

The decision of the Bankruptcy Court[4] was affirmed by the Eleventh Circuit Court of Appeals on April 2, 2012, as to the three false statements upheld by the District Court.   Defendant's Exhibit 128; In re Phillips, 476 F. App'x 813 (11th Cir. 2012).

### D. 2012 Efforts to Sell Property, Compromise Settlement Agreement, and Reach Entireties Property

By the Spring of 2012, the Property had been on the market for almost five years without selling, the Trustee suspected Debtors were not really trying to sell the Property, and Mr. Phillips' denial of a discharge in bankruptcy had been affirmed by the Eleventh Circuit Court of Appeals.   The parties then started to get more serious about resolving the matter, although with conflicting agendas.   Most of the discussions did not occur between the bankruptcy principals themselves (the Trustee and the

---

[4]"When the District Court affirms a Bankruptcy Court's order, as here, we consider the Bankruptcy Court's decision directly, reviewing the factfindings for clear error and legal conclusions de novo."   In re NICA Holdings, Inc., 810 F.3d 781, 786 (11th Cir. 2015) (citing In re Brown, 742 F.3d 1309, 1315 (11th Cir. 2014)).

Debtors), but between and among multiple attorneys and their assistants, several real estate agents, and a title company and its employees and attorneys.  Three chronologically overlapping themes emerge from the evidence:  Debtors' efforts to sell the Property; Debtors and the Trustee's efforts to compromise the Settlement Agreement payoff amount; and Epic Aviation's efforts to collect its domesticated Oregon money judgment by reaching the Property despite its tenancy by entireties ownership.

**(1)  Epic Aviation Aims For Entireties Property**

From July 19, 2012, through October 31, 2014, Epic Aviation's Collection Manager Greg J. Gettig (Mr. Gettig) contemporaneously prepared a series of Priority Credit Review Action List documents, Plaintiffs' Exhibits 43A-X, which essentially constitute a running summary of events in connection with the Phillips "litigation account" for Epic Aviation management.  Mr. Gettig was a credit manager for Epic Aviation for about 15 years before his recent retirement, and was responsible for the Phillips account file. Mr. Gettig reported to Mr. Green and others in Epic Aviation management on a regular basis.  The thrust of these documents show that Epic Aviation, buoyed by its success in thwarting Mr. Phillips' discharge in bankruptcy, was intent on reaching the entireties Property to satisfy its domesticated Oregon money

judgment despite clear law and facts precluding it from doing so as either a judgment creditor or a bankruptcy creditor.

In the first Priority Credit Review Action List of record, on July 19, 2012, Mr. Gettig wrote that although the balances due to Epic Aviation were written off in 2009, Epic Aviation was "poised . . . to initiate steps to force sale of home which is in joint tenancy (with wife who is not part of our transaction) or direct settlement with Phillips to avoid sale." Plaintiffs' Exhibit 43A at p. 954. Mr. Gettig also wrote that "Epic will need to determine if Motion to Levy on Real Property, which Epic has Judgment lien on, and initiate foreclosure is the most cost effective method to protect its interest depending on the results of debtor exam findings." Id.

**(2) Debtors' Undisclosed Sales Contract; Settlement Agreement Compromise Efforts; Title Issues**

In July 2012, Debtors' efforts to sell the Property, as required by the Settlement Agreement, finally bore fruit. On July 23, 2012, James Patrick Morrissy (Mr. Morrissy) signed a Sales Contract and Addendum, Defendant's Exhibit 24, to purchase the Property from Debtors for $4.325 million cash, with a deposit of $500,000, and a scheduled closing date of August 30, 2012. The Sales Contract required Debtors to provide "good and marketable" title, and was contingent upon an adequate appraisal and an

engineer's determination that the house would support a tile roof that Mr. Morrissy wanted to install.  Id.  Mr. Morrissy was represented by real estate attorney Gary K. Wilson and his staff (generally referred to as Mr. Morrissy's attorney or a similar phrase).  Mr. Morrissy's real estate agents were Susan Weidlich (Ms. Weidlich) and Chris Ryker (Ms. Ryker) (generally referred to as Mr. Morrissy's real estate agents or other similar phrase).

The sales price which Mr. Morrissy agreed to pay was a reasonable one, and was greater than a retrospective appraisal of the Property performed by Epic Aviation's appraiser.  On June 1, 2015, appraiser Halas Neal Scott prepared an Appraisal of Real Property, Defendant's Exhibit 64, which determined, based on the sales comparison approach, that the Property was valued at $4.25 million as of October 12, 2012.

Not coincidentally, late in the afternoon of July 23, 2012, Debtors' bankruptcy counsel renewed his September 2011 offer to the Trustee's counsel to compromise the Settlement Agreement for $400,000.  Defendant's Exhibit 70.  Debtors' bankruptcy counsel failed to disclose the existence of the Morrissy Sales Contract to the Trustee or her counsel.  Debtors signed this Sales Contract on July 24, 2012.  Defendant's Exhibit 24.  On July 25, 2012, Debtors raised their settlement offer to the Trustee to $500,000, Defendant's Exhibit 70, which the Trustee accepted.  The Morrissy

Sales Contract was still not disclosed to the Trustee or her attorney, and the Trustee testified at trial that she would not have accepted this compromise if she had known about the Morrissy Sales Contract.

Effective July 26, 2012, Old Republic National Title Insurance Company (Old Republic, the Fund, or the Title Company) issued a title Commitment, Defendant's Exhibit 1, for the Property and Mr. Morrissy.  The Commitment contained a list of twenty requirements to be accomplished before a title insurance policy would issue, most of which were routine and easily accomplished. Id., Schedule B-1.  Five of the requirements related to the pending bankruptcy cases (requirements 2, 9, 10, 11, 12).  Id. Additionally, the requirements included obtaining a release of Epic Aviation's domesticated 2004 Oregon judgment against Mr. Phillips (requirement 13).  Id.  As will be seen by correspondence, this last requirement was based upon the Title Company's persistent but mistaken belief that Epic Aviation's domesticated money judgment attached to the Property.

For the next several months, Debtors and Mr. Morrissy's representatives worked on addressing title issues and closing the Sales Contract.  Simultaneously, Debtors' counsel and the Trustee's counsel worked on a compromise of the amount required by the Settlement Agreement.

Having accepted Debtors' $500,000 compromise offer, on July 31, 2012, the Trustee filed a Motion to Approve Compromise of Controversy Between Trustee and Jeffrey S. Phillips. Defendant's Exhibit 71. The proposed compromise was the Debtors' payment of $500,000 to the Trustee, with $262,500 (52.5%) being allocated to Mr. Phillips' bankruptcy estate and $237,500 (47.5%) being allocated to Mrs. Phillips' bankruptcy estate, and the Trustee's release of all Debtors' obligations under the Settlement Agreement. Id. at ¶ 15. The Trustee stated that this was in the best interest of the bankruptcy estate because the Property had remained unsold for so long and Mr. Phillips' discharge in bankruptcy had been denied. Id. at ¶ 16. The Trustee also stated that the compromise would benefit the estate by eliminating the continued time for the sale and the risk that the Property would not be sold for an additional period of time. Id. at ¶ 17. Debtors had still not informed the Trustee of the signed Morrissy Sales Contract, and the Trustee remained unaware of the Morrissy Sales Contract. Additionally, there is no evidence that Epic Aviation knew of the existence of this Sales Contract.

While Bankruptcy Court approval of the proposed compromise of the Settlement Agreement was pending, the Debtors and Mr. Morrissy worked towards closing their Sales Contract. On August 8, 2012, counsel for Mr. Morrissy caused the title Commitment to be

forwarded to Debtors' real estate counsel[5] so he could work on the
various B-1 requirements.  Defendant's Exhibit 132.  On August
10, 2012, Mr. Morrissy's counsel requested a summary and timetable
of the steps Debtors' counsel would be taking with regard to the
Commitment requirements.  Defendant's Exhibit 134.  Debtors'
bankruptcy counsel promptly responded that the Property was both
TBE (tenancies by entireties) and homesteaded, and was not part of
the bankruptcy cases, except that the Trustee had been granted a
lien which would be released pursuant to a compromise.  Id.
Debtors' bankruptcy counsel further stated that "[t]he Epic
judgment does not attach to the property as it is both TBE and
homestead." Id.  Debtors' real estate attorney worked on getting
the payoff amounts for the first and second mortgages.
Defendant's Exhibit 3.

Also on August 10, 2012, Epic Aviation's Priority Credit
Review Action List, Plaintiffs' Exhibit 43B, repeated that Epic
Aviation was "poised . . . to initiate steps to force sale of home
which is in joint tenancy (with wife who is not part of our
transaction) or direct settlement with Phillips to avoid sale."
Id., p. 982.  Mr. Gettig also repeated that "Epic will need to

---

[5] References to Debtors' real estate counsel and similar
phrases refer to attorney Douglas A. Wood and the attorneys,
paralegals, and employees in his law office.

determine if Motion to Levy on Real Property, which Epic has
Judgment lien on, and initiate foreclosure is the most cost
effective method to protect its interest depending on the results
of debtor exam findings." Id. There was no indication that Epic
Aviation knew of the pending Morrissy Sales Contract at the time.

Despite the clearly correct proposition that Epic Aviation's
domesticated money judgment did not attach to the Property, the
Title Company had its own ideas of what it wanted in order to issue
a title insurance policy. On August 14, 2012, Mr. Morrissy's
counsel responded to Debtors' bankruptcy counsel that the Title
Company's attorney wanted, among other things, an order from the
bankruptcy court confirming that the Epic Aviation money judgment
does not attach to the Property. Defendant's Exhibits 134, 136.
On August 16, 2012, work continued on the title requirements, with
Debtors' bankruptcy counsel handling some of the items.
Defendant's Exhibit 138. There was an emphasis on the bankruptcy
matters and the Epic Aviation judgment, which were viewed by Mr.
Morrissy's attorney as title defects. Defendant's Exhibit 139.

**(3)   Epic Aviation Objects To Proposed Settlement
Agreement Compromise, Makes a Counter-Offer,
and Re-Records Its Money Judgment**

Back in the Bankruptcy Court, on August 21, 2012, Epic
Aviation became the only creditor to file an Objection To Motion
to Approve Compromise of Controversy Between Trustee and Jeffrey

S. Phillips.   Court's Exhibit I.   Epic Aviation asserted that
Debtors had failed to sell the Property for five years and had
consistently priced it above fair market value in order to thwart
their obligations under the Settlement Agreement.   Based upon past
misconduct by Mr. Phillips, which led to the denial of his
bankruptcy discharge, Epic Aviation asserted that the Trustee
should not discount the Settlement Agreement amount but should
file an adversary complaint to revoke the discharge of Mrs.
Phillips, and raise other challenges to Debtors' claimed
exemptions.   Id. at ¶ 10.

On August 23, 2012, at 10:24 a.m., Epic Aviation re-recorded
the General Judgment and Money Award in the Public Records of
Collier County, Florida.   Plaintiffs' Exhibit 3.   While the reason
for the re-recording is not in the trial record, bankruptcy counsel
for Epic Aviation informed the Court during closing arguments, in
response to a question from the Court, that he had caused the re-
recording because he had concerns over the legal sufficiency of
the original recorded judgment.

In an August 23, 2012, 5:05 p.m. email, Mr. Morrissy's
attorney emailed Mr. Morrissy's realtor summarizing his
discussions that morning with Debtors' bankruptcy counsel.
Defendant's Exhibit 161.   The email provided that Debtors'
bankruptcy counsel had stated that Epic Aviation filed a motion at

the last minute opposing the compromise settlement worked out with
the Trustee; that Epic Aviation held a large judgment against Mr.
Phillips; and that unless [Mr.] Phillips could work out a deal
with Epic Aviation, there was a bankruptcy hearing scheduled for
September 11, 2012.[6]  Id.  Mr. Morrissy's attorney stated that the
appeal period for any resulting order was 14 days, and the earliest
the closing could occur would be the end of September.  Id.  Mr.
Morrissy's  counsel  further  stated  that  he  had  told  Debtors'
bankruptcy  counsel  that  Mr.  Morrissy  was  unlikely  to  grant  an
extension of the closing date, so it would be in the Debtors' best
interest to resolve the matter with Epic Aviation at the earliest
possible date.  Id.  Mr. Morrissy's counsel stated "[a]s an aside,
we now believe the judgment does not attach to the property, since
it is only against Scott Phillips and the property is owned by
Scott and his wife as an estate by the entirety."  Id.

### (4) Debtors Vacate Property; Morrissy Sales Contract Terminated

Effective August 25, 2012, plaintiffs signed a two year lease
to move into a residence on Silverleaf Lane, Naples, Florida.
Defendant's Exhibit 89.  Plaintiffs moved out of the Property and
into the new residence shortly thereafter.  Mr. Phillips testified

---

[6]The actual date of the bankruptcy hearing was September 18,
2012.  Court's Exhibit J.

at trial that he and his wife were going to move out of the Property whether it sold to Mr. Morrissy or not.

On August 29 and 30, 2012, Mr. Phillips, Mrs. Phillips, and Mr. Morrissy signed a Termination of Sales Contract and Deposit Release and Directive.  Defendant's Exhibits 5, 142.  The Sales Contract for the purchase of the Property was terminated and the deposit was directed to be returned.  Defendant's Exhibit 5.  The signed Termination was emailed to Debtors' real estate agent on August 30, 2012.  Defendant's Exhibit 4.  Mr. Morrissy terminated the Sales Contract because he was not willing to wait for the bankruptcy case(s) to conclude, and felt he could not otherwise obtain marketable title and title insurance.

**(5) Epic Aviation's Continued Opposition to Compromise of Settlement Agreement and Continued Sights On Entireties Property**

Although the Morrissy Sales Contract had now been terminated, there was still the matter of the Trustee's proposed compromise of the Settlement Agreement pending in the Bankruptcy Court.  On September 13, 2012, Epic Aviation's bankruptcy counsel took Mr. Phillips' deposition in connection with the Trustee's Motion to Approve Compromise of Controversy Between Trustee and Jeffrey S. Phillips.  Defendant's Exhibit 91.  When asked if he had "received any offers on the property?" Mr. Phillips replied "None.  No.  Nothing" except for "goofy", "would-you-takes" offers.

Defendant's Exhibit 91, 18:12-19.   In light of the formerly executed Morrissy Sales Contract, this was clearly a false representation intended, in the Court's view, to further Debtors' effort to compromise the $825,000 Settlement Agreement for $500,000 without full disclosure to the Trustee.

On September 14, 2012, Mr. Gettig wrote in his Priority Credit Review Action List that Mr. Phillips had testified at the deposition to the effect that "all assets owned are either in wife Bonnie name (not Epic customer) or by Tenants in the Entirety." Plaintiffs' Exhibit 43C, p. 1071.   Epic Aviation's counsel was directed to initiate garnishment on accounts belonging to Scott Phillips.  Id.  Mr. Gettig also wrote that Epic Aviation, counsel for Mr. Phillips, the Trustee, and the Trustee's counsel were having discussions "to consider Epic purchasing Trustee's rights in the bankruptcy estate for an amount not determined as of this publication.  The basis for Epic proceeding forward on purchasing Trustee's interest in [sic] based on Epic's success in blocking Scott Phillips' discharge as well as based on the estimated equity in real property of $2MM in Naples, Florida."  Id.

### (6)   Proposed Compromise Morphs Into Auction

On September 18, 2012, the Bankruptcy Court held a hearing on the Trustee's motion to approve the proposed compromise of the Settlement Agreement.   Court's Exhibit J.   Epic Aviation offered

to pay the Trustee $525,000 for the Trustee's rights under the Settlement Agreement, and the Trustee orally requested a continuance of the hearing in order to allow the parties to reach a compromise agreement or have a public auction of the Trustee's rights under the Settlement Agreement.  Epic Aviation and Debtors agreed to the request.

Later that day, with the consent of the Debtors, the Trustee filed a Report and Notice of Intention to Sell Property of the Estate at Public Sale, Court's Exhibit K, stating an intent to hold a public sale of all the Trustee's rights and interests in and to the Settlement Agreement.  This Notice stated that the "Price" was "Highest Bid" and the sale would be to the "Highest Bidder."  The "Terms" of the auction were:  (1)  The minimum bid would be $525,000.00, with 10% down and the balance to be paid within 48 hours of the conclusion of the telephonic auction; (2) all qualifying bids were to be received by the Trustee by 5 p.m. on September 27, 2012; (3) the telephonic auction would be conducted on September 28, 2012 at 2 p.m., if at least two qualifying written bids and deposits were received; (4) the balance of the high bid was due within 48 hours of the conclusion of the auction; (5) if the highest bidder failed to fulfill the auction terms, the Trustee "will sell the rights to the next highest bidder at the last bid price;" and (6) auction bids were to be in $25,000

increments, subject to the increments being lowered by the Trustee during the auction.   Id.

### (7)   Debtors' Continued Efforts to Sell Property to Morrissy and Continued Title Company Issues

With an auction of the Trustee's rights under the Settlement Agreement on the near horizon, the Debtors continued their efforts to sell the Property.  While the Morrissy Sales Contract had been terminated, there were still efforts to obtain a new contract and consummate a sale to Mr. Morrissy.  A series of pre-auction emails in mid-September 2012, show continued interest in selling the Property to Mr. Morrissy and continued Title Company issues based on the bankruptcy cases and the Epic Aviation money judgment.

In a September 18, 2012 email, Defendant's Exhibit 144, the Morrissy's real estate agent reported that a hearing had taken place and all except one item had been settled, which would be resolved by September 28, 2012.  It was also indicated that the Debtors may re-enter into a purchase contract effective September 29, 2012, with a closing date of October 15, 2012.  Mr. Morrissy wanted some concession for the delays and additional legal fees, and for Debtors to "make [him] an offer", but the Debtors were "adamant" that they would not entertain any contract except on the previously agreed terms.

In a September 25, 2012, 12:40 p.m. email, the Title Company's underwriting counsel (Sun Mi Shin) advised Mr. Morrissy's attorney that she had reviewed the Bankruptcy Court pleadings and docket, and the Title Company could not make any requirements or decisions until after the anticipated September 28 auction of the Trustee's rights and interest under the Settlement Agreement.  Defendant's Exhibit 147, p. 4.  Underwriting counsel also noted that there was a hearing set for October 28 that could impact the Title Company's ability to make any requirements on the commitment.  Id. Underwriting counsel further stated that it was unclear why the seller believed other matters could be resolved by October 15, unless based on information not available through the Bankruptcy Court's docket.  Underwriting counsel requested any available additional information, noting "[a]s an aside, this is a complex, contentious and unusual BR case so we need to be cautious."  Id.

In a September 25, 2012, 2:48 p.m. email, Mr. Morrissy's attorney responded to the Title Company's underwriting counsel with questions about the purpose of the October 28 hearing, whether the Epic Aviation judgment had been dealt with, and whether the Title Company would accept an affidavit of continuous marriage. Id., p. 3.

In a September 25, 2012, 2:55 p.m. email, Mr. Morrissy's attorney emailed the Debtors' real estate attorney and their

bankruptcy attorney, Defendant's Exhibit 6, stating that the Title Company had the following concerns about the title and the bankruptcy cases:  The Title Company would not make any decisions until after September 28, the date set for the auction of the Trustee's rights and interest under the 2007 Settlement Agreement; there was a bankruptcy hearing set for October 28 for which the Title Company may have to wait; and October 15 had been mentioned as a proposed closing date, but the Title Company was unclear why this was possible given the Bankruptcy Court's calendar.  Id.  Mr. Morrissy's attorney requested additional information, and the status of the Epic Aviation judgment.  Id.

Underwriting counsel responded in a September 25, 2012, 3:09 p.m. email to Mr. Morrissy's attorney that the October 28 hearing was on Epic Aviation's objection to the Trustee's motion to compromise the Settlement Agreement; that this may become moot depending on the September 28 auction bid; and that the Epic Aviation judgment had not been dealt with, but "[i]t is still a requirement and we won't rely upon a continuous marriage affidavit for that as we do not believe that it protection [sic] under the Federal BR rules."  Defendant's Exhibit 147, p. 3.

On September 27, 2012, at 2:04 p.m., Mr. Morrissy's counsel emailed both Debtors' bankruptcy counsel and their real estate counsel, stating that the Epic Aviation judgment was still an issue

according to the Title Company's underwriting counsel, who had stated: "We believe that the BR court does not recognize T/E for purposes of avoiding judgments and therefore will not rely upon it for the Epic judgment. However, if the BR attorney can provide us with the legal basis to do so, we will review." Defendant's Exhibits 6, p. 1; 73, p. 4. Debtors' real estate attorney responded the same day, expressing confusion: "I am confused, even if the bankruptcy court does not recognize T/E for purposes of avoiding judgment, that would only mean that the judgment is not discharged through bankruptcy. Even if that is the case, the judgment would still not attach to T/E property pursuant to Florida law. Am I missing something? May I speak with your underwriting counsel?" Defendant's Exhibit 6, p. 1.

Various emails indicate that the various real estate professionals were confused about whether, and when, a sale would occur. Defendant's Exhibits 6, 147, 148, 149.

### (8) The September 28, 2012 Auction

The telephonic auction was conducted on September 28, 2012. Court's Exhibit L. The bidding commenced at $525,000, and eventually Debtors bid $750,000. Id., pp. 3-4, 6. Epic Aviation then bid $825,000. Id., p. 7. Rather than exceed this bid, Debtors said they would stop bidding and just pay off the full original Settlement Agreement amount of $825,000. Id., p. 8.

After some discussion off the record, the Trustee stated that if Mr. Phillips was willing to pay the $825,000 (less his previous deposit) within 48 hours, the Trustee would not sell her rights under the Settlement Agreement, but would accept Debtors' full payoff of the Settlement Agreement.   Epic Aviation objected, stating that Debtors no longer had a right to pay the Settlement Agreement amount after participating in the auction, and that Debtors did not win the auction because they were not the highest bidder.   The Trustee gave Mr. Phillips until October 2, 2012, to put the money into the Trustee's trust account, where it would remain pending a hearing in the Bankruptcy Court to address Epic Aviation's objection.   Id., p. 14.

Mr. Green testified he believed that, at the time of the auction, Epic Aviation knew Debtors had an interested purchaser[7], and knew Debtors' equity in the Property was in excess of $1 million.   Mr. Green testified that Epic Aviation would not have tried to purchase the Trustee's rights without that equity in the Property, but also stated that Epic Aviation believed there was other potential value in the Trustee's Settlement Agreement rights.   Mr. Green testified that Epic Aviation's interest in

---

[7]From the documents in the record, it seems unlikely that Epic Aviation actually knew about the interest of Mr. Morrissy or any specific individual as of the auction date.

trying to acquire the Trustee's rights and responsibilities under the Settlement Agreement was twofold:  (1) To investigate further challenges that the Trustee had outlined for her objection to the homestead exemption; and (2) to continue to seek opportunities for payments of amounts owed under the domesticated Oregon money judgment.  Mr. Green testified that Epic Aviation believed there may have been an intentional failure to pay under the Settlement Agreement, which may have constituted a breach, and could result in a revocation of Mrs. Phillips' discharge, affording Epic Aviation an opportunity to re-examine the homestead exemptions which were the foundation of the Settlement Agreement.  Mr. Green testified that while the $825,000 lien on the Property was worth $825,000, the issue of the homestead exemptions were, in Epic Aviation's view, potentially more valuable.  The Trustee testified at trial that it was her understanding that Epic Aviation wanted to step into the Trustee's shoes and assume her fiduciary duties to the other bankruptcy creditors.

Mr. Green also testified that during the auction process Epic Aviation engaged in settlement discussions with Debtors.  He testified that at one point there was an offer by the Debtors to pay Epic Aviation $325,000 and to pay the Trustee $500,000, but the Trustee would not agree.  Discussions went back and forth without success.  The Court notes that the types of settlement

discussions referred to by Mr. Green were not for the benefit of all creditors (despite Epic Aviation's argument to the contrary), but were aimed at substantial recovery for Epic Aviation at the ultimate expense of the other creditors.

**(9)  Debtors' Post-Auction Efforts to Sell Property**

After the auction, Debtors' representatives worked towards putting a deal together with Mr. Morrissy.   In a September 28, 2012, 2:23 p.m. email, Debtors' bankruptcy counsel advised Debtors' real estate counsel and Mr. Morrissy's counsel that the "auction" had just concluded, and Debtors had agreed to satisfy the $825,000 settlement amount to the Trustee, which would be accepted by the Trustee.   Defendant's Exhibit 73, p. 3.   Debtors' bankruptcy counsel requested that an immediate closing be scheduled and a form of release be provided for the Trustee.   Id.

In an email later that day, Mr. Morrissy's attorney told Mr. Morrissy's realtor that he would discuss the auction and the Epic Aviation judgment with the Title Company's underwriting attorney the following Monday and hoped for something more definitive. Id., pp. 1-2.   The Title Company was informed that the auction was completed, and later on September 28, 2012, requested more detailed information from Debtors' attorneys.   Defendant's Exhibits 7, p. 2; 75, p. 1.

On the morning of October 2, 2012, Mr. Morrissy's attorney sent an email to Mr. Morrissy's real estate agent summarizing what had transpired at the auction and noting an upcoming bankruptcy court hearing on October 28.  Defendant's Exhibit 148.  Mr. Morrissy's Counsel concluded:  "Given the contentious bankruptcy matter, the aggressive way Epic is pursuing Phillips, and the possibility Phillips may be unable to comply with the terms of the auction, there are many unanswered questions at this time.  I cannot recommend that Mr. Morrissy enter into a contract until we get more definitive answers."  Id., p. 2.

**(10) Debtors' Request for Extension of Trustee's Deadline; Debtors' Disclosure of Interested Purchaser**

Debtors did not provide the Trustee with the funds on the October 2, 2012, the deadline established by the Trustee. Instead, the Debtors filed an Emergency Motion for Enlargement of Time to Make Settlement Payment to the Trustee and for Order Authorizing the Sale of the Debtors' Homestead Property. Plaintiffs' Exhibit 25.  In the Emergency Motion, the Debtors argued that the 48 hour payment deadline should not apply because they were fulfilling the Settlement Agreement, not complying with the auction terms.  The Debtors stated that they had received a verbal offer to purchase the Property for $4.175 million, which was sufficient to pay all mortgages and the $825,000.00 to the

Trustee, however "issues have arisen relating to Epic's conduct during the auction and Epic's judgment against Debtor, Jeffrey S. Phillips only." Id., ¶ 6. Debtors stated that a 10% deposit had been wired and that they were prepared to immediately wire an additional $500,000 pending the closing of the sale, but that they did not believe that they should have to pay the full $825,000 "due to the unknown agenda of Epic." Id., ¶ 8. Debtors indicated that the Trustee's prior motion to compromise "has essentially [been] withdrawn" by the Trustee, Debtors were prepared to pay the full payoff amount in the original Settlement Agreement, and the reasons for an auction were no longer present. Id., ¶ 9. Debtors requested an unspecified amount of additional time to make full payment and for an order authorizing sale of the Property free and clear of any lien of Epic Aviation.

This October 2, 2012, motion by Debtors is the first disclosure to Epic Aviation, the Trustee, and the Bankruptcy Court of any current offer to purchase the Property. Despite the non-disclosure, by this time the Trustee was to get all she would ever be entitled to receive under the Settlement Agreement – the $825,000. The pending sale of the Property was consistent with the terms of the Settlement Agreement, although for significantly more than the $3 million the Trustee had recommended in late 2010.

Epic Aviation filed a written Response, Court's Exhibit M, making a "limited objection" to the enlargement of time to make the settlement payment.  Epic Aviation asserted that the Debtors were essentially conceding that their bid above $500,000 at the auction had been with money they simply did not have.  Epic Aviation further argued that Debtors had not shown grounds for the Bankruptcy Court to award additional time to comply with their auction obligations.  Id., ¶¶ 16-17.

**(11) Debtors' Continued Discussions Regarding Sale to Mr. Morrissy; Epic Aviation Requested to State Position on Whether Its Money Judgment Attached to the Property**

While the motion for an extension was pending, Debtors continued their efforts to clear up title issues and sell the Property to Mr. Morrissy, despite his attorney's stated reluctance.

In an October 3, 2012 9:55 a.m. email, Debtors' bankruptcy counsel told Epic Aviation's bankruptcy counsel that he needed to know if Epic Aviation was claiming any lien or interest in the jointly owned homestead property.  Plaintiff's Exhibit 49, p. 2. If not, counsel requested confirmation that Epic Aviation would provide a partial release of its judgment lien relating to the jointly owned homestead property so that a prompt closing could occur and Debtors could fully fund the settlement.  Id.

Epic Aviation's bankruptcy counsel responded later that morning as follows:

> Releasing a lien implies that a lien has attached. Recording a judgment lien attaches only to interests for which the law provides a lien. If the title company believes the judgment lien attaches to the property at issue, please let us know.
>
> As I mentioned last night, this is really a title company issue as they drive what is, or is not, "clear" title as it would be relevant to any proposed sale. They should be able to tell you that by now if you ordered a commitment; it's a quick process.

Id., pp. 1-2. To this lawyerly but non-responsive answer, Debtors' bankruptcy counsel promptly replied that they both knew it was not quite that simple, concluding that his question was "will Epic provide a partial release? Simple question." Id., p. 1. Epic Aviation provided no response to this simple question, and the record does not reflect that Epic Aviation ever agreed to, or executed, any release.

In an October 3, 2013 1:15 p.m. email, Mr. Morrissy's real estate agent advised the Debtors' real estate agents that Mr. Morrissy was "unwilling to get tangled into a financial mess that appears to have more questions than answers." Defendant's Exhibit 149, p. 2. An October 5, 2012 10:28 a.m. email among the real estate professionals, however, stated that Mr. Morrissy was still interested in the Property "but will not move forward with it until

the seller gets his issues cleared up." Defendant's Exhibit 149,
p. 1.   Reference was made to the October 28 Bankruptcy Court
hearing, and a wait-and-see attitude was expressed.   Id.

In an October 5, 2012 11:04 a.m. email, Debtor's bankruptcy
counsel asked Mr. Morrissy's counsel if Mr. Morrissy would provide
a written contract with an express contingency of court approval
and a hard deadline to close with no deposit. Defendant's Exhibits
7, p. 2; 75, p. 1.   Debtors' bankruptcy counsel said he would like
to have the information for an upcoming bankruptcy court hearing.
Id.

In an October 5, 2012 3:38 p.m. email response, Mr. Morrissy's
counsel advised Debtors' counsel that Mr. Morrissy would not enter
into a contract at the time.   Defendant's Exhibit 7, p. 1.   He
further stated that "[o]nce you resolve the BR and Epic related
issues, please let me know and I will contact the Buyer to
determine [if] he has any interest in the property at that time."
Id.   Debtors' bankruptcy counsel responded on October 8, 2012,
that while he understood the response, he had made a representation
to the Court that the client made a verbal offer to purchase the
property, and if that was not the case he had to advise the court.
Id.

### (12) Bankruptcy Court Hearing; Order on Deadline Extension Request; Debtors' Payment; Trustee's Release

On October 9, 2012, the Bankruptcy Court conducted a hearing on Debtors' motion requesting an extension of time to deposit their funds.  Plaintiffs' Exhibit 28, Exh. B.  Debtors' bankruptcy counsel summarized the events at the auction, and stated that because of Epic Aviation's objection to the way the auction was concluded, the Trustee was not in a position to sign a release in exchange for the $325,000 remaining payoff amount.  Id., pp. 4-11.  Debtors' bankruptcy counsel stated that he had the balance of the funds in his trust account ready to be paid to the Trustee, pending resolution of the Epic Aviation objection.  Id., pp. 12-13, 14.

Epic Aviation's bankruptcy counsel argued that the terms of sale at the auction did not allow payment conditioned upon the sale of other property, and the Notice clearly required all monies to be paid within 48 hours.  Id., pp. 19-20.  Epic Aviation stated that it sent $825,000 to the Trustee, and it was willing and able to close as the highest bidder at the auction.  Id., p. 20.  Epic Aviation further argued that the auction was noticed as going to the highest bidder, and that the terms and conditions of the auction were violated when the auction was terminated by the

Trustee's decision to allow Debtors to pay their original obligation under the Settlement Agreement.  Id., p. 21.

The Trustee's position was that if the Debtors could fund the $825,000 within 48 hours of a Bankruptcy Court ruling, she would accept that as the highest and best offer at the auction.  If the Debtors are unable to fund the $825,000, the Trustee would sell her rights to Epic Aviation as the second highest and best bid. The Trustee's position was that she had the business judgment and discretion to decide the auction winner.  Id., pp. 23-24.

Later on October 9, 2012, the Bankruptcy Court filed an Order on Debtors' Emergency Motion for Enlargement of Time to Make Settlement Payment to the Trustee and For Order Authorizing Sale of the Debtors' Homestead Property.  Plaintiffs' Exhibit 26; Defendant's Exhibit 60.  This Order adopted the oral findings and determinations made at the hearing, id., p. 2, in which the Bankruptcy Court found: Debtors' motion was timely filed; the Trustee was in the best position to determine the highest and best bid at the auction; and if Epic Aviation was determined to be the winning bid, and the $825,000 was tendered by the Debtors, Epic Aviation would be obligated to accept the payment.  Plaintiffs' Exhibit 28, Exh. B, pp. 29-30.  The Bankruptcy Court noted that the Settlement Agreement did not have a deadline for payment, did not provide for interest, and did not provide for anything other

than that the Debtors would list the Property for sale.  Id., pp. 33-34.

The Bankruptcy Court's Order granted the emergency motion for enlargement of time "only to the extent that the Debtors seek additional time to fund the purchase price at the auction sale by paying $825,000 in full satisfaction of the Settlement." Plaintiffs' Exhibit 26, p. 2.  The Debtors were directed to wire transfer the difference between the $825,000 bid and the previous deposit to the Trustee on or before 5:00 P.M., October 11, 2012. If the Debtors timely made this payment, (i) the Debtors would be deemed to be the successful bidder at the auction sale; (ii) the Settlement would be deemed paid in full, (iii) the Trustee would provide the Debtors a release and satisfaction of the lien created by recordation of the Settlement Order, and (iv) the Trustee would return all monies paid by Epic Aviation, LLC, in connection with the auction.  If the Debtors failed to pay the remaining funds as provided, then (i) Epic Aviation, LLC, would be deemed the successful bidder at the auction/sale; (ii) the Trustee would assign all of her rights under the Settlement to Epic Aviation, LLC, and (iii) the Trustee would return the deposit paid by the Debtors in connection with in the auction.  Id. at pp. 2-3.

Debtors timely paid the remaining balance of the $825,000. On October 9, 2012, the Trustee executed a Satisfaction and Release

of Lien and Interest (Satisfaction and Release) satisfying and releasing Debtors of any and all right, claim or interest held by the Trustee in connection with her Objection to Exemptions, and the Order Approving Joint Motion for Authority to Compromise Controversies.  Plaintiffs' Exhibit 4.  On October 10, 2012, at 10:16 a.m. Debtors recorded the Satisfaction and Release of Lien and Interest in the Collier County, Florida Official Records.  Id.

On October 10, 2012 at 10:56 a.m., Debtors' real estate counsel emailed Mr. Morrissy's realtor a copy of the Trustee's recorded Satisfaction and Release of Lien and Interest, and inquired if Mr. Morrissy was ready to go back into contract and whether there were any other outstanding issues.  Defendant's Exhibits 9; 157, p. 3.  Mr. Morrissy's counsel forwarded the Release to the Title Company's underwriting counsel, noting that Debtors' real estate attorney was still taking the position that Epic Aviation's domesticated money judgment was not a lien on the Property.  Defendant's Exhibit 157, pp. 2-3.  Underwriting counsel responded that the Title Company still had an issue with the Epic Aviation judgment, and that its last communications related to a partial release to be signed by Epic Aviation and a request for some federal bankruptcy law from Debtors' bankruptcy counsel. Id., p. 2.

**(13) Epic Aviation Files Notice of Appeal; Post-Order Motion to Stay and Motion to Remove Judgment Lien**

On October 10, 2012, Epic Aviation filed a Notice of Appeal of the Order on Debtors' Emergency Motion for Enlargement of Time to Make Settlement Payment to the Trustee and For Order Authorizing Sale of the Debtors' Homestead Property (the Auction Order Appeal). Plaintiffs' Exhibit 5.  This was an appeal to the District Court, sitting in an appellate capacity.  Plaintiffs do not assert that the filing of this Notice of Appeal with the Bankruptcy Court constituted a slander of their title (only that the subsequent recording of the Notice of Appeal in the Official Records did so).

With the Bankruptcy Court having upheld the Trustee's agreement to accept Debtors' $825,000 as completion of their obligations under the Settlement Agreement, and an appeal of that order having been filed, the parties addressed two matters in post-order motions.  Epic Aviation wanted to stay the sale of the Property while it pursued its appeal, and Debtors wanted to resolve any argument that Epic Aviation's domesticated money was a lien which attached to the Property.

On October 10, 2012, Epic Aviation filed an Emergency Motion for Stay Pending Appeal, Court's Exhibit N, with the Bankruptcy Court in order to prevent the sale of the Property.  Epic Aviation asserted that if Debtors moved forward with their proposed sale of

the Property it would be deprived of the rights it purchased from
the Trustee, including its lien on Debtors' property under the
Settlement Agreement, and its right to relief on appeal.   Id.
Epic Aviation requested a stay precluding the sale of the Property
while its appeal was pending.   Epic Aviation's Motion did not
assert any rights to the Property pursuant to its recorded
judgment, just rights to the Settlement Agreement Epic Aviation
asserted it had purchased from the Trustee.

Also on October 10, 2012, the Debtors filed Debtors' Emergency
Motion to Avoid Judicial Lien of Epic Aviation, LLC, Plaintiffs'
Exhibit 27, in the Bankruptcy Court in order to clear title to the
Property so it could be sold.   The motion stated that Debtors were
in receipt of a verbal offer to purchase the Property; the Property
is exempt from Epic Aviation's domesticated Oregon judgment both
as homesteaded property and as tenants by the entireties property;
Epic Aviation would never have any rights to the Property since
its judgment is solely against Mr. Phillips; while Epic Aviation's
judgment lien does not attach to the Property, it impairs the
exemptions of each Debtor; and the Title Company believed that
Epic Aviation's judgment created a title issue that must be
resolved before any sale of the Property.   Id.   Debtors requested
an order avoiding Epic Aviation's judgment lien and further
appropriate relief.   Id.   Debtors did not request any relief in

connection with the effect of the recently filed Notice of Appeal of the Auction Order.

Additionally, on October 10, 2012, Debtors's bankruptcy counsel emailed Epic Aviation' bankruptcy counsel confirming that he had advised counsel for Epic Aviation that the Phillips believed Epic Aviation was intentionally slandering title to Bonita Phillips' jointly owned homestead property and was tortiously interfering with her ability to sell the property to a third party. Plaintiffs' Exhibit 9.  The email further confirmed that Epic Aviation and its counsel had actual knowledge of the potential sale and Phillips' view that Epic Aviation was jeopardizing that sale; and that Epic Aviation would be held liable for damages if the sale was thwarted.  Id.

On October 12, 2012, Epic Aviation filed a Response of Epic Aviation LLC To Debtors' Emergency Motion to Avoid Judicial Lien of Epic Aviation, LLC and Objection To Debtors' Claims of Exemptions, Plaintiffs' Exhibit 28.  Epic Aviation stated that in light of Debtors' Emergency Motion, it was objecting to "all and each of the Debtors' respective claims to exemption, or to any allegedly exempt property, claimed in each of their respective bankruptcy cases, to the fullest extent available under the Bankruptcy Code and Florida law."  Id. at ¶ 5.  Epic Aviation adopted the objections filed by the Trustee in March 2007, id. at

¶ 6, which had been settled in 2007 by the Settlement Agreement. Without providing any factual basis, Epic Aviation asserted that Debtors were not entitled to claim the Property as a homestead exemption or held as tenants by the entireties. Id. at ¶ 7. Thus, the Response at least implicitly asserted that Epic Aviation's domesticated money judgment did attach to the Property.

On October 12, 2012, the Bankruptcy Court held a hearing on both motions at 2:05 p.m., Court's Exhibit O. When pressed by the Bankruptcy Court judge, Epic Aviation's bankruptcy counsel suggested that if it was the owner of the Trustee's rights (as Epic Aviation asserted), it could refuse to accept the $825,000 from Debtors, seek to revoke Mrs. Phillips' discharge, become a joint creditor for the $825,000, and bring an action to rescind a prior sale of the Jet 1, Inc. stock by "unwinding" that provision of the 2007 Settlement Agreement, all of which would be further litigated in bankruptcy court.

After hearing arguments, the Bankruptcy Court summarized the procedural history of the case, concluding that the Trustee essentially called off the auction and decided to allow Debtors the opportunity to pay the full amount under the Settlement Agreement. The Bankruptcy Court noted that this could be viewed either as the Trustee determining the Debtors were the highest and best offer at the auction, or that the Trustee determined to go

forward with the provisions of the Settlement Agreement. The Bankruptcy Court found that the Trustee had determined that Debtors' offer was the highest and best offer pursuant to the terms of the auction, and gave Debtors a time limit in which to transmit funds into the Trustee's trust account. The Bankruptcy Court further found that it had the discretion to grant the extension of time, the decision was not clearly erroneous, and the relevant factors did not weigh in favor of granting a stay pending appeal. (Id., pp. 53-55.)

As to Epic Aviation's judgment lien, the Bankruptcy Court indicated that the avoidance would be granted if a Continuous Marriage Affidavit was filed establishing that the parties were married when the Property was acquired and that it was acquired as tenants by the entireties. Epic Aviation would have an opportunity to seek reconsideration on a good faith basis. (Id., pp. 65, 68.) The Continuous Marriage Affidavit was filed, Court's Exhibit P, and Epic Aviation did not seek reconsideration. The Bankruptcy Court's written order, discussed below, was filed on October 17, 2012.

On October 12, 2012, Mr. Gettig wrote in his Priority Credit Review Action List that the "short version" of the outcome of the court hearing earlier that day was that "both of us paid the Trustee, but the recent actions of the debtor have opened a giant

hole for us to stay Trustee's right to accept their money, appeal the judge's decision to let the Trustee accept the debtor's money AND (better yet) argue against the homestead exemption and debtor discharge."   Plaintiffs' Exhibit 43D, p. 517 (emphasis in original).   Mr. Gettig also wrote that he attended the October 9 emergency court hearing about debtors' claim that Epic is slandering the title to their residence and willfully interfering with their settlement with the Trustee.   He noted that the claims were without merit, but could result in a lawsuit.   He further wrote "Epic will counter that it has now purchased the Trustee's interest and rights to the settlement so we can move to foreclose on the home as both Trustee and judgment creditor.   Epic may further move to have the court deny the discharge of the spouse (like we succeeded in doing with her husband).   Such a denial might let Epic be paid from the assets held by both husband and wife (entireties property)."   Id. at p. 517.

## E. Epic Aviation's First Two Allegedly Slanderous Recordings

Against this contentious litigation background, Epic Aviation recorded three documents in the Official Records of Collier County, Florida which Debtors assert constituted a slander to their title in the Property.   The first two are discussed below.

### (1)   Notice of Appeal of Auction Order

On October 12, 2012, at 11:22 a.m., Epic Aviation recorded in the Collier County Official Records a copy of its Notice of Appeal of the Auction Order to the United States District Court. Plaintiffs' Exhibit 5.   Attached to the Notice of Appeal was a copy of the Auction Order.   Id.   Plaintiffs assert that this recorded Notice of Appeal constituted a slander of their title to the Property.

### (2)  Notice of Lis Pendens

Less than three hours later, on October 12, 2012, at 2:06 p.m., Epic Aviation recorded a Notice of Lis Pendens in the Official Records of Collier County, Florida regarding the Auction Order.   Plaintiffs' Exhibit 6; Defendant's Exhibit 56.   The Notice of Lis Pendens bore the caption and case numbers of the Bankruptcy Court proceedings, and stated that "Epic Aviation, LLC, an Oregon limited liability company, has initiated this action to preserve its interests and rights under its appeal of that certain Order on Debtors' Emergency Motion for Enlargement of Time to Make Settlement Payment to the Trustee and For Order Authorizing Sale of the Debtors' Homestead Property, with respect to the property described in below: [setting forth legal description of the Property]."  Id.  Plaintiffs assert that this recorded Lis Pendens constituted a slander of their title to the Property.

According to Mr. Green, Epic Aviation authorized the filing of the lis pendens, knew the Property was Debtors' primary residence, and knew that Mr. Phillips had stated he had an interested buyer for the Property. Mr. Green testified that the filing of the lis pendens was to make sure that Epic Aviation's pursuit of the rights of the Trustee under the Settlement Agreement did not become moot. Epic Aviation did not want the Property to be sold, which Epic Aviation believed would moot its appeal. Mr. Green also testified that the lis pendens was to improve Epic Aviation's chances of collecting on the domesticated money judgment. To Mr. Green's knowledge, this is the only lis pendens Epic Aviation has ever filed in any litigation matter.

**F. Resolution of Money Judgment As Lien on Property**

> **(1)  Epic Aviation Concedes Money Judgment Does Not Attach to Property**

Before the entry of the written order on the motion to stay and the motion for judicial relief from the money judgment, Epic Aviation's bankruptcy counsel conceded that its money judgment against Mr. Phillips did not attach to the Property. On October 16, 2012, Epic Aviation's bankruptcy counsel sent an email to Debtors' bankruptcy counsel. Defendant's Exhibit 151, pp. 5-6. Epic Aviation's counsel stated in part that he saw no need for the still-pending motion to avoid judicial lien because "[n]o one is

saying that a judgment lien attached to the Property; . . . I'll agree that the judgment lien does not attach to the Property, I don't see any other issues that need to be addressed." Id., p. 6. Despite this concession, Epic Aviation did not withdraw its objection to Debtors' pending motion seeking judicial relief from the Bankruptcy Court.

Later on October 16, 2012, Debtors' bankruptcy counsel emailed underwriting counsel and Mr. Morrissy's counsel attaching a copy of Epic Aviation's bankruptcy counsel's email. Defendant's Exhibits 8, p. 1; 151, p. 4. Debtors' bankruptcy counsel observed that Epic Aviation's counsel "admits that the lien did not attach to the property," and that the senior underwriting counsel at the Title Company "sees no issue with Epic's judgment." Defendant's Exhibit 8, p. 1. Debtors' bankruptcy counsel noted that they had recorded a continuous marriage affidavit, asked if they can move forward with the sale of the Property, and noted that Debtors are dangerously close to losing the sale. Id. Debtors' real estate attorney then asked Mr. Morrissy's attorney to let him know the status of going back into contract and closing on the Property. Defendant's Exhibit 151, p. 4.

Mr. Morrissy's counsel forwarded the email to Mr. Morrissy's real estate agent, and asked to be informed of the status of going back to contract and closing. Id., p. 3. Mr. Morrissy's counsel

stated that if it is really not an issue, Epic Aviation should sign the release he had sent the previous week.  Id.  The next day, underwriting counsel agreed, stating that "[s]ince Epic doesn't feel it is a lien on the property, then a release of the property should satisfy all parties."  Id., p. 2.  Epic Aviation never signed any partial release.

**(2)  Bankruptcy Court's Written Orders Re: Stay and Judicial Lien**

On October 17, 2012, the Bankruptcy Court filed a written Order Granting Debtors' Emergency Motion To Avoid Judicial Lien of Epic Aviation, LLC.  Plaintiffs' Exhibit 29; Defendant's Exhibit 158.  The Bankruptcy Court noted that Epic Aviation had questioned whether there was record evidence supporting the tenancies by the entireties nature of the Property, and that Debtors had filed an Affidavit of Continuous Marriage and a copy of the Warranty Deed to both Debtors as husband and wife.  Id.  The Bankruptcy Court found that Epic Aviation's domesticated money judgment was a judicial lien that impaired an exemption to which each of the Debtors was entitled on the Property "even though the Epic Judgment does not actually attach to the Property (because Epic only has a claim or judgment against Debtor Jeffrey S. Phillips)."  Id.  The Bankruptcy Court ordered that the judicial lien against the Property is avoided because it impairs the tenancy by the

entireties exemption, and that "[t]he judicial lien of Epic, to the extent that it may constitute a lien on the Property, is hereby extinguished as to the Property only." Id.

On October 17, 2012, Debtors' bankruptcy counsel sent a copy of the Bankruptcy Court's Order to underwriting counsel for the Title Company. Defendant's Exhibit 158. Underwriting counsel responded that there was still a fourteen day appeal period. Id.

On October 19, 2012, Mr. Gettig wrote in his Priority Credit Review Action List that Epic Aviation was considering filing a motion to stay the trustee from releasing the lien on the residence while it appealed the decision of the Bankruptcy Court to accept Debtors' payment. Plaintiffs' Exhibit 43E, p. 525. Epic Aviation's $825,000 payment to the Trustee had been returned to it. Id.

On October 22, 2012, Mr. Morrissy's attorney emailed Mr. Morrissy's real estate agents that he was trying to confirm from the Bankruptcy Court records that the appeal from the order involving the Trustee was now moot since Debtors had paid the Trustee. Defendant's Exhibit 153. Counsel also wrote that he was trying to get the Title Company's underwriter to commit to a closing date, but the Title Company was concerned about the appeals period and their ability to timely determine whether an appeal had been filed. Id. Counsel opined that it was unlikely that Epic

Aviation would appeal, but noted it had appealed "every other order." Id. Counsel raised several provisions to be included in a sales contract for the Property, but expressed continuing concern if Epic Aviation were to appeal the October 17, 2012 Order. Id.

On October 23, 2012, the Bankruptcy Court entered a written Order Denying Emergency Motion for Stay Pending Appeal of the Auction Order for the reasons stated on the record at the October 12, 2012, hearing. Court's Exhibit R. The Bankruptcy Court's findings are set forth supra, pp. 48-49.

On October 26, 2012, Epic Aviation filed an Emergency Motion to Set Aside Sale and Motion for a Stay Pending Appeal with the District Court. Court's Exhibit S. Epic Aviation argued that the Debtors and the Trustee had violated the automatic stay under Federal Rule of Bankruptcy Procedure 6004(h) regarding the sale of property, and based on a likelihood of prevailing on the merits.

### (3) Fallout From Lis Pendens Recording

On October 29, 2012, at 2:49 p.m., Debtors' bankruptcy counsel sent an email to Epic Aviation's bankruptcy counsel requesting that Epic Aviation immediately withdraw the lis pendens, provide information as to applicable insurance related to the filing, and explain why a copy was not served on him as Debtors' counsel. Plaintiffs' Exhibit 10. According to Mr. Green, Epic Aviation was

aware that Mr. Phillips had said he had an interested buyer at the time and had a sale pending.

On October 29, 2012, the Trustee signed another Satisfaction and Release of Lien and Interest.   Plaintiffs' Exhibit 7.   On October 30, 2012 at 3:32 p.m. Debtors recorded the second Trustee's Satisfaction and Release of Lien and Interest in the Official Records of Collier County.   Plaintiffs' Exhibit 7.   This document again stated that the Trustee fully satisfied and releases "any and all right, claim or interest held" by the Trustee in connection with the Trustee's Objections to Exemptions and Order Approving Joint Motion for Authority to Compromise Controversies . . . and "consents that the same shall be satisfied and released of record in all respects."   Id.   This second Release was filed because Epic Aviation's bankruptcy counsel took the position that the first recorded Release was premature because it should not have been filed until 14 days had expired from its signing.   Defendant's Exhibit 86, pp. 2-3; Plaintiffs' Exhibit 33, p. 8.

On October 30, 2012, Debtors filed their Emergency Motion to Dissolve Lis Pendens Filed by Epic Aviation, LLC, Plaintiffs' Exhibit 30, asserting that the lis pendens filed against the Property was improper and illegal under Florida Statute § 48.23. Epic Aviation's Response, Plaintiffs' Exhibit 31, asserted that the Bankruptcy Court lacked subject-matter jurisdiction over the

motion after the filing of a Notice of Appeal, and in any event, the lis pendens was lawful.

The Bankruptcy Court held a hearing on the Emergency Motion To Dissolve on November 5, 2012. Plaintiffs' Exhibit 33. On November 7, 2012, the Bankruptcy Court issued its Order Granting Debtors' Emergency Motion to Dissolve Lis Pendens Filed by Epic Aviation, LLC. Plaintiffs' Exhibit 32. The Bankruptcy Court found "that there is an insufficient nexus between the Debtors' jointly owned homestead property [ ] and the dispute asserted by Epic relating to the appeal of this Court's Order on Emergency Motion for Enlargement of Time to Make Settlement Payment to the Trustee and For Order Authorizing Sale of Debtor's Homestead Property", granted the motion, and dissolved the lis pendens. Id.

On November 7, 2012, Epic Aviation filed a Notice of Appeal in the Bankruptcy Court, Plaintiffs' Exhibit 8, from this Order (the Lis Pendens Dissolution Order Appeal). Epic Aviation's appeal to the District Court was assigned Case No. 2:12-cv-669-FTM-29. Debtors do not claim this filing slandered their title, but assert that the subsequent recording of it in the Official Records does so.

On November 9, 2012, the undersigned denied Epic Aviation's Emergency Motion to Set Aside Sale and Motion for a Stay Pending Appeal in a written Opinion and Order, and noted that there was

nothing to prevent the sale of the homestead property. Plaintiff's Exhibit 38.

### (4)  Renewed Efforts to Sell Property to Mr. Morrissy

On November 12, 2012 at 10:15 a.m., Debtors' bankruptcy counsel emailed Mr. Morrissy's counsel attaching a copy of the undersigned's November 9, 2012 Opinion and Order.  Defendant's Exhibit 74.  Counsel asked that the matter be discussed with Mr. Morrissy and let him know "where we are."  Id.

Also on November 12, 2012, Debtors' bankruptcy counsel inquired by email of Epic Aviation's bankruptcy counsel whether Epic Aviation was going to withdraw the appeals and let Debtors sell the Property.  Plaintiffs' Exhibit 12.  Debtors' bankruptcy counsel asserted that Epic Aviation's filings in the public record and appeals were precluding the sale transaction from moving forward, and reserved all rights, including claims for attorney fees, compensatory damages, and punitive damages.  Id.  Mr. Green testified that Epic Aviation was aware of Debtors' position as expressed to its counsel.  There is no record that Epic Aviation or its bankruptcy counsel responded, and Epic Aviation's appeals were never withdrawn.

Epic Aviation's appeals had a clear adverse effect on the potential sale of the Property.  In a November 13, 2012 email, Mr. Morrissy's counsel stated that the attorney for the Title Company

had reviewed the Bankruptcy Court docket and found three "still outstanding" matters:  Epic Aviation's appeal of the dismissal of the lis pendens; Epic Aviation's appeal of the Trustee's extension of time; concern over whether Epic Aviation would appeal the recent District Court Opinion and Order.  Defendant's Exhibit 74.

In a November 14, 2012, 8:08 a.m. email, Debtors' bankruptcy counsel told Mr. Morrissy's counsel that Epic Aviation was considering withdrawing the appeals, and gave the date its brief was due.  Plaintiffs' Exhibit 13; Defendant's Exhibit 74.  Epic Aviation apparently did not consider the matter for long, however.

**G. Third Allegedly Slanderous Recorded Document**

Instead of withdrawing its two pending appeals, Epic Aviation recorded another Notice of Appeal in the Official Records of Collier County.  On November 14, 2012, at 8:35 a.m. Epic Aviation recorded a copy of its November 7, 2012 Notice of Appeal of the Lis Pendens Dissolution Order in the Official Records of Collier County, Florida.  Plaintiffs' Exhibit 8.  A copy of the Dissolution Order was attached to the Notice of Appeal.  Id. Plaintiffs assert this constituted a slander of their title to the Property.  According to Mr. Green, Epic Aviation filed this Notice of Appeal to preserve its rights under the auction and to collect amounts owed by Mr. Phillips on the domesticated Oregon judgment.

### H. Debtors' Renewed Efforts to Sell Property

### (1) Second Morrissy Contract; Epic Aviation Settlement Effort

On November 19, 2012, Mr. Morrissy signed another Sales Contract, Plaintiffs' Exhibit 14; Defendant's Exhibit 76, for the purchase of the Property.  Debtors signed on November 20, 2012. Id.  The price was $4.315 million cash with a $25,000 deposit. Debtors committed to obtaining a dismissal of all litigation in the Bankruptcy Court regarding the Property, including appeals, a discharge of all lis pendens, and resolution of the Epic Aviation domesticated judgment.  Id. at Addendum.  By agreeing to obtain resolution of the domesticated judgment, Debtors agreed to do more than Epic Aviation could ever have compelled them to do in the bankruptcy cases.

On November 20, 2012, at 10:28 a.m., Debtors' bankruptcy counsel emailed Mr. Morrissy's counsel, Defendant's Exhibit 10, a copy of the new Morrissy contract and stated that he did not think Epic Aviation would provide an actual "release" of its judgment. Counsel stated that Epic Aviation's judgment on the Property had been expressly avoided by Order of the Bankruptcy Court and that Order had not been appealed.  Id.

In his December 28, 2012 Priority Credit Review Action List, Mr. Gettig summarized the litigation activities, noting that Epic Aviation's counsel had discussed withdrawal of the appeal in

federal court in return for a release of claims for legal expenses, but Phillips and Epic Aviation were unable to reach a consensus. Plaintiff's Exhibit 43H, p. 626.  The next step was to "[n]egotiate with debtor to settle all matters for $400[k] since the sale of the residence is allegedly in process."  Id.  Mr. Green testified that at this point in time Epic Aviation was trying to make sure that the sale of the Property did not moot its opportunity to show on appeal its entitlement to the Trustee's rights under the action. On December 31, 2012, Epic Aviation offered to settle all matters. Plaintiffs' Exhibit 43J, p. 489.

In his January 4, 2013, Priority Credit Review Action List, Mr. Gettig again summarized the litigation activities and gave a short history of the matter.  Plaintiffs' Exhibit 43I.  Mr. Getting noted that Debtors may claim that Epic Aviation is slandering the title to their residence and willfully interfering with their settlement with the Trustee.  Id., p. 502.  Under "Next Steps", Mr. Getting wrote "EPIC presented an offer to settle all matters for $500[k][8] on December 31 since the sale of the residence is allegedly in process.  Response expected anytime."  Id.  Mr.

---

[8] Mr. Gettig incorrectly uses "m" (million) to refer to amounts that are clearly meant to refer to thousands (k). Therefore, the corrections are made throughout this Opinion and Order for clarification.

Gettig included a slightly more detailed summary in his January 11, 2013, Priority Credit Review Action List indicating that the offer of settlement was rejected and countered. Plaintiffs' Exhibit 43J, p. 489.

On January 8, 2013, Debtors' bankruptcy counsel sent an email to Epic Aviation's bankruptcy counsel stating that Debtors were contractually obligated to close in about one week, and the buyer "will walk" if there is not a timely closing. Plaintiffs' Exhibit 16. Debtors' bankruptcy counsel stated that the only impediment to closing was Epic Aviation's pending appeals, and the buyer's counsel would not close unless the appeals are resolved or Epic Aviation provided a limited release as to the Property. Id. Debtors' bankruptcy counsel "implore[d]" opposing counsel to convince Epic Aviation to let the closing occur, stating the price was extraordinary and the damages from the lost sale would be substantial. Id. On January 11, 2013, Debtors' bankruptcy counsel sent Epic Aviation's counsel a copy of the fully executed November 2012 Morrissy contract. Plaintiffs' Exhibits 17, 18.

There is no response from Epic Aviation or its bankruptcy counsel in the trial record, and no release or withdrawal of appeals were ever executed by Epic Aviation.

**(2) Bankruptcy Court Approves Sale of Property, Orders Escrow of Net Proceeds; Epic Aviation Appeals**

In the absence of a response from Epic Aviation, on January 11, 2013, Debtors filed an Emergency Motion For Order Approving Sale of Debtors' Property Free and Clear of any Interest of Epic Aviation, LLC, Plaintiffs' Exhibit 34, in the Bankruptcy Court. Debtors sought Bankruptcy Court approval of the sale of the Property free and clear of Epic Aviation's interests, i.e., the interests created by the pending appeals because Epic Aviation had no interest in the Property. Debtors pointed out that while Epic Aviation had a $322,603.30 pre-petition judgment against Mr. Phillips, Epic Aviation would never have rights against the Property, which was jointly owned with Mrs. Phillips as tenants by the entirety. (Id., ¶ 8.)

On January 15, 2013, Epic Aviation filed a Response, Court's Exhibit T, stating that the residence was claimed as exempt property by Debtors, and was therefore no longer property of the bankruptcy estate. Therefore, Epic Aviation argued, Debtors could not sell the property as requested. Id. The Bankruptcy Court held a hearing on January 15, 2013, Court's Exhibit U, indicating that if Epic Aviation were to seek a stay pending appeal, it would be denied and that it should go straight to the district court. Id., p. 23.

On January 17, 2013, the Bankruptcy Court filed an Order Granting Debtors' Emergency Motion for Order Approving Sale of Debtors' Property Free and Clear of Any Interest of Epic Aviation, LLC.   Plaintiffs' Exhibit 35.   The Bankruptcy Court found that it had the power and authority to grant the request pursuant to Section 105 of the Bankruptcy Code, and in furtherance of its prior October 9, 2007 order approving the Settlement Agreement, the October 9, 2012 order enlarging time to make settlement payment, its October 17, 2012 order to avoid judicial lien, and its November 7, 2012, order dissolving lis pendens.   Id. at ¶ B.   The Order authorized Debtors to sell the Property free and clear of any interest of the Chapter 7 Trustee and/or Epic Aviation, including any interest arising out of Epic Aviation's appeals.   Id. at ¶ 3. As a condition of the sale, however, Debtors were required to escrow the net proceeds of the sale.   Any interest of the Trustee or Epic Aviation in the Property was to attach exclusively to the net proceeds and not follow the property transferred to the buyer, so that marketable title would pass to the buyer.   Id. at ¶ 4.

On January 17, 2013, Epic Aviation filed a Notice of Appeal, Plaintiffs' Exhibit 36 (the Sale Order Appeal), and an Emergency Motion For A Stay Pending Appeal, Court's Exhibit V, to which Debtors filed a Response in Opposition, Court's Exhibit W.   In his

January 18, 2013, Priority Credit Review Action List, Mr. Gettig
stated that Epic Aviation would

> [c]ontine the appeal efforts filed Jan 17 in
> US Bankruptcy Court to delay sale of Phillips'
> primary residence, expected to close Jan 21.
> Phillip's response is due within 20 days.
> This filing preserves the main asset involved
> in EPIC's appeal in Federal District Court of
> the bankruptcy Judge's decision to accept
> debtor's payment of $825[k] mediated
> settlement instead of recognizing EPIC's
> winning bid in the action of trustee's rights.

Plaintiffs' Exhibit 43K, p. 493.  Mr. Gettig also wrote that "[i]f
the sale of the residence fails, we expect a slander of title to
be filed by Phillips.  Our counsel is adamant that we have not
slandered title and will prevail on challenge."  Id.

In his January 25, 2013, Priority Credit Review Action List,
Mr. Gettig repeated that Epic Aviation would "[c]ontinue the appeal
efforts filed Jan 17 in US Bankruptcy Court to delay sale of
Phillips' primary residence, expected to close Jan 21" which
"preserves the main assert involved in EPIC's appeal. . . ."
Plaintiff's Exhibit 43L, p. 497.  After summarizing the litigation
activities, Mr. Gettig wrote:  "Jan 18-Phillips offers $100[k] to
settle globally all matters, to include release judgment and
appeal.  EPIC declined."  Id., p. 498.

A HUD Settlement Statement, Plaintiffs' Exhibit 15;
Defendant's Exhibit 45, showed the distribution of funds from Mr.

Morrissy if the sale had closed.  Both the first and second mortgages would be paid off, $825,000 would be allotted for the Trustee, and net proceeds of $1,602,871.34 would be placed in escrow for satisfaction of the Epic Aviation judgment.  Id.  Thus, had the closing taken place, Epic Aviation would have had a $1.6 million fund available from which to satisfy its judgment, which was estimated to be approximately $800,000 with late fees and interest.  Or, if indeed it was to act in the shoes of the Trustee, it would have had this sum available for the other creditors.

Mr. Gettig's February 1, 2013, Priority Credit Review Action List summarized the activities in the case.  Plaintiff's Exhibit 43M.  It noted that on December 31, 2012, Epic Aviation offered to settle all matters for $500,000 since the sale of the residence was allegedly in process.  Id., p. 656.  Mr. Gettig noted that Phillips rejected this offer, and countered at $50,000 and possibly as high as $100,000.  Id.  Under "Next Steps" Mr. Gettig wrote: "Continue the appeal efforts filed Jan 17 in US Bankruptcy Court to delay sale of Phillips' primary residence, which was expected to close Jan 21."  Id., p. 655.

**(3)  Debtors' Continued Efforts To Sell Property**

A series of emails between Mr. Morrissy's attorney and Debtors' real estate attorney addressed the title issues. Defendant's Exhibit 160.  On February 1, 2013, Mr. Morrissy's

attorney informed Debtors' real estate attorney that the Title Company was not willing to close the sale of the Property in escrow while the appeals were still pending.  Id., p. 5.  Debtors' real estate attorney responded by asking whether Mr. Morrissy would be willing to let him find a title company.  Id.  On February 4, 2013, Mr. Morrissy's attorney stated that after the District Court ruled on the appeal he would present the matter to another underwriter and take it back to the Title Company.  Id., p. 4. Debtors' real estate attorney responded that Debtors would be willing to rent the Property until title was cleared, subject to certain conditions.  Id.  On February 5, 2013, Mr. Morrissy's attorney responded that Mr. Morrissy wanted to wait for the District Court order, and upon receipt either revisit the escrow closing concept with the Title Company or another underwriter. This would also put him in a better position to determine if renting made more sense.  Id., p. 1.

These early February, 2013 efforts of the attorneys to salvage the deal were to no avail.  Defendant's Exhibit 160.  On February 13, 2013, Mr. Morrissy signed a Termination of Sales Contract and Deposit Release and Directive in connection with his second contract to purchase the Property.  Defendant's Exhibits 11, 44, 154.  Mr. Morrissy terminated the contract pursuant to the Addendum because of the ongoing litigation in the Bankruptcy Court.

Defendant's Exhibit 44. On February 18, 2013, Debtors' relator emailed the executed Termination of Sales Contract back to Mr. Morrissy's real estate agent with Debtors' signatures. Defendant's Exhibit 154, p. 1.

Mr. Gettig's March 1, 2013 Priority Credit Review Action List noted that, as of February 28, there was no record of the sale of Debtors' primary residence filed in Florida court records. Plaintiff's Exhibit 43N, p. 478.

**(4) District Court Decision on Three Appeals**

On March 5, 2013, the undersigned heard oral argument in the related appeals of three Bankruptcy Court orders: (1) the Order on Debtors' Emergency Motion for Enlargement of Time to Make Settlement Payment to the Trustee and For Order Authorizing Sale of the Debtors' Homestead Property issued on October 9, 2012; (2) the Order Granting Debtors' Emergency Motion to Dissolve Lis Pendens Filed by Epic Aviation, LLC issued on November 7, 2012; and (3) the Order Granting Debtors' Emergency Motion for Order Approving Sale of Debtors' Property Free and Clear of Any Interest of Epic Aviation, LLC issued on January 17, 2013. Defendant's Exhibit 184, p. 6.

On March 15, 2013, Mr. Gettig wrote in the Priority Credit Review Action List that Epic Aviation was "[a]wait[ing] overdue appellate ruling in Federal District Court of decision in

bankruptcy court to permit debtor to settle with trustee for $825[k]. Reversal could lead to challenging the discharge of creditors by the spouse of our guarantor, thereby letting us collect by foreclosing on the primary residence." Plaintiff's Exhibit 43O, p. 692. Mr. Gettig continued: "The guarantor [Mr. Phillips] has significant seven figure equity in his primary residence. Our key barrier is its joint ownership with his spouse whose obligations to creditors were discharged in bankruptcy. Our guarantor's bankruptcy was denied after our challenge, which survived two appeals after many years. Though he owes significant amounts to many creditors, we have judgments and others have not pursued them." Id. This entry was made despite Epic Aviation's bankruptcy counsel's prior statement that the domesticated judgment did not attach to the Property.

On May 6, 2013, Debtors advised the District Court that while they had stated at oral argument on the appeals that the sale had been lost due to the pending appeals, they had obtained the interest of another purchaser who was ready, willing, and able to move forward with purchase contract for the home. Court's Exhibit X.

On May 7, 2013, the District Court affirmed the Bankruptcy Court's Auction Order and Lis Pendens Order, and vacated the Sale Order after being advised that the sales contract [with Mr.

Morrissy] had been lost.  Plaintiffs' Exhibit 39.  The undersigned
found that Epic Aviation's appeal was not moot, id., pp. 21-22;
and that whether the Trustee's acceptance of $825,000 from the
Debtors was viewed as having been done pursuant to the terms of
the Settlement Agreement or as a determination that Debtors were
the winning bidder at the auction, the order of the Bankruptcy
Court approving the extension of time for Debtors to pay the
$825,000 and dissolving the lis pendens were affirmed, id., pp.
22-30.

Mr. Gettig wrote in the May 10, 2013, Priority Credit Review
Action List that Epic Aviation would appeal the District Court
decision, and that "[p]revailing on appeal could lead to denial of
discharge for the spouse of our guarantor."  Plaintiff's Exhibit
43P, p. 794.  He also wrote that "[t]he effect of our appeal on
the trustee is not yet clear."  Id.

On May 14, 2013, Epic Aviation filed a Notice of Appeal to
the Eleventh Circuit Court of Appeals.  Court's Exhibit Y.

**(5)  Debtors File Suit in District Court**

On June 3, 2013, Debtors filed their two-count Complaint (Doc.
#1) in the current case in the U.S. District Court for the Middle
District of Florida, Fort Myers Division, alleging slander of title
and seeking to quiet title to the Property.

**(6)  John Connors Sales Contract**

On June 16 and 17, 2014, plaintiffs entered into a Sales Contract with John M. Connors Jr. to sell the Property for $4.4 million cash, with a $10,000 deposit.  Plaintiffs' Exhibit 19; Defendant's Exhibit 81.  The Addendum labeled as Schedule BII (Schedule) to this contract required Debtors to satisfy the title requirements set forth in a First American Title Commitment.  Id.; Defendant's Exhibit 15.

On June 17, 2014, Debtors' Renewed Motion For Order Approving Sale of Debtors' Property Free and Clear of Any Claim or Interest of Epic Aviation, LLC was filed.  Plaintiffs' Exhibit 40.  Debtors attached a copy of the signed John Connors Sales Contract and the title insurance commitment, and sought an order authorizing the sale of the Property, as provided in one of the Commitment's express requirements.  Id., ¶ 11 & Exh. A.

On June 18, 2014, an email from Debtors' bankruptcy counsel to Epic Aviation's bankruptcy counsel attached a fully executed copy of the Connor Sales Contract and title insurance Commitment, and asked whether Epic Aviation would either stipulate to an order approving the sale or provide a limited release of any claim against or interest in the Property so the closing could occur.  Plaintiffs' Exhibit 20.  The email stated that Epic Aviation's

filings in the public record and pending appeals were the only things preventing the closing.   Id.

On July 18, 2014, Mr. Gettig wrote in the Priority Credit Review Action List that Epic Aviation was requesting the Eleventh Circuit to reverse and remand the case back to the Bankruptcy Court to conduct a full and fair auction "to gain control of the Trustee's position in the bankruptcy case."  Plaintiff's Exhibit 43R, p. 939.   This changed rationale occurred only after the slander of title case was filed against Epic Aviation.

On July 22, 2014, Debtors' bankruptcy counsel emailed Debtors' real estate professionals to inquire whether the contract was still active, whether the buyer was still on board, and if they could get an appropriate court order.  Defendant's Exhibit 82.  On July 24, 2014, the real estate attorney for Mr. Connors asked Debtors' real estate counsel to provide an update concerning Debtors' efforts to satisfy the title Commitment requirements as set forth in the Sales Contract Schedule.  Defendant's Exhibit 112.  Debtors' real estate counsel then emailed Mr. Connors' attorney that he and Debtors' bankruptcy attorney were working on the title requirements.  Defendant's Exhibit 111.  The parties followed-up on August 19, 2014.  Defendant's Exhibit 17.

On September 22, 2014, Mr. Gettig signed an Affidavit in Oregon stating that the name of the Judgment debtor is J. Scott

Phillips, identifying the debtor's social security number, and stating that the Debtors last known address was 3060 Green Dolphin Lane, Naples, Florida 34102. Plaintiffs' Exhibit 22. This Affidavit was recorded in the Official Records of Collier County, Florida on September 23, 2014 at 12:16 p.m. Id. There is no record explanation for the second re-recording, but Epic Aviation's bankruptcy counsel informed the Court in closing argument that he was concerned that the second recorded judgment was still insufficient.

**(7) Eleventh Circuit Court of Appeals Decision; Subsequent Activity**

On September 24, 2014, the Eleventh Circuit Court of Appeals affirmed the opinions and orders of the District Court and the Bankruptcy Court. Plaintiffs' Exhibit 41; Defendant's Exhibit 63.

By letter dated September 24, 2014, and emailed the same day at 3:45 p.m., Connors' real estate attorney notified Debtors' real estate counsel that Mr. Connors was electing to terminate the Sales Contract to purchase the Property pursuant to the Due Diligence provision of the Schedule. Plaintiffs' Exhibit 24; Defendant's Exhibits 18, 49. By email dated September 24, 2014, 5:02 p.m., Epic Aviation's bankruptcy counsel asked for a copy of Debtors' pending Sales Contract for the Property and stated he would be

discussing the Eleventh Circuit's opinion with his client the next day.  Plaintiffs' Exhibit 23.

In Mr. Gettig's October 3, 2014 Priority Credit Review Action List, he noted the Eleventh Circuit's decision, stating that "actions continue to support EPIC's right to lien interests in debtors' residence, currently for sale."  Plaintiff's Exhibit 43V, p. 545.  Mr. Gettig made reference to the fact Epic Aviation had filed a lis pendens on the Property, and that Debtor had equity "of multiple millions" in the Property.  Id., p. 546.

In early October 2014, efforts to resolve title questions from Old Republic National Title Insurance Company continued. Defendant's Exhibit 86.  On October 25, 2014, Mr. Phillips emailed his real estate agent indicating that renovations on the Property had commenced and the he wished to raise the price of the house. Defendant's Exhibit 88.

### (8)  2015 Sale of Property

In response to interrogatories in this case, Mr. Green verified that as of March 13, 2015, Epic Aviation "had no knowledge of any delay in the sale of the Plaintiff's residence." Plaintiffs' Exhibit 42, p. 5.  The Court finds this statement to be patently and knowingly false.

On May 18, 2015, Debtors' sought a hearing and an award of attorney's fees incurred in connection with the motion to dissolve

the lis pendens and the resulting appeal.  Defendant's Exhibit 62,
p. 3.  On July 10, 2015, after a hearing, the Bankruptcy Court
filed an Order Denying Debtors' Motion for Attorney Fees and Costs
Against Epic Aviation, LLC, in Connection With *Lis Pendens*, Without
Prejudice.  Id.

On November 2, 2015, the Property was sold to Mr. and Mrs.
Tague for $4.9 million.  Defendant's Exhibits 162, 163.

Additional facts as found by the Court will be set forth below
as necessary to address specific issues.

## II.  Conclusions of Law

Florida has long recognized a cause of action for slander
of title.  Lehman v. Goldin, 36 So. 2d 259 (Fla. 1948) (adopting
Restatement (First) of Torts §§ 624-626 (1938)).  While "slander
of title" has been referred to by a number of labels, Sailboat
Key, Inc. v. Gardner, 378 So. 2d 47, 48 (Fla. 3d DCA 1980), it is
most often used interchangeably with the label "disparagement of
title", Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.,
831 So. 2d 204, 207 n.1 (Fla. 4th DCA 2002) (citations omitted).

Slander of title is generally defined in Florida as "a false
and malicious statement, oral or written, made in disparagement of
a person's title to real or personal property, or of some right of
his, causing him special damage."  Old Plantation Corp. v. Maule
Indus., Inc., 68 So. 2d 180, 181 (Fla. 1953).  See also Atkinson

v. Fundaro, 400 So. 2d 1324, 1326 (Fla. 4th DCA 1981) ("Slander of title is the wrongful, intentional and malicious disparagement of vendibility of title to real property", citing Old Plantation Corp.) The elements have been variously stated:

> It is the modern view that disparagement of one's title to real property affects its value and marketability by reason of the impact upon third persons; that where the conduct of the tortfeasor consists solely in the communication to third persons of a false idea concerning plaintiff's ownership of property, it is not plaintiff's interest in the property itself that is invaded and affected so much as its salability. Thus liability is generally imposed upon a defendant who (a) communicates to a third person (b) statements disparaging the plaintiff's title, (c) which are not true in fact, and (d) which cause the plaintiff actual damage.

Gates v. Utsey, 177 So. 2d 486, 488 (Fla. 1st DCA 1965).  More recently, a Florida appellate court stated:

> In a disparagement action the plaintiff must allege and prove the following elements: (1) A falsehood (2) has been published, or communicated to a third person (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff and (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages are proximately caused as a result of the published falsehood.

Bothmann v. Harrington, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984).

See also McAllister v. Breakers Seville Ass'n, Inc., 981 So. 2d

566, 573 (Fla. 4th DCA 2008); IberiaBank v. Coconut 41, LLC, 984
F. Supp. 2d 1283, 1304 (M.D. Fla. 2013), aff'd, 589 F. App'x 479
(11th Cir. 2014).

In a slander of title cause of action, Florida courts seem to
distinguish between presumed malice and actual malice.

> In an action for slander of title, 'malice'
> merely means a lack of legal justification and
> is said to be 'presumed' if the disparagement
> is false, if it caused damage, and if it is
> not privileged. [W]hen the defendant
> disparages plaintiff's title under
> circumstances supporting a privilege, the
> presumption of malice is rebutted and, as in
> a case of defamation, the plaintiff must then
> prove actual or genuine malice in order to
> recover. This means that malice, in the
> ordinary sense of the term, is not important
> at all except to defeat the defense of
> privilege or to enhance damages."

Gates, 177 So. 2d at 488-89. Relying on Gates, the court in Cont'l
Dev. Corp. stated that "[w]hile malice is an element of a cause of
action for slander of title, a plaintiff sustains his burden of
proof once he establishes that a defendant has communicated untrue
statements to a third person which disparage the plaintiff's title
and cause him actual or special damage. [ ] So, malice can be
presumed to exist if a plaintiff establishes these elements of his
claim." Cont'l Dev. Corp. of Fla. v. Duval Title & Abstract Co.,
356 So. 2d 925, 927 (Fla. 2d DCA 1978) (internal citations
omitted). The court further noted "that while actual malice is

not necessary to recover compensatory damages in a slander-of-title action, a plaintiff always must prove actual malice in order to recover punitive damages." Id. at 928.  Thus, actual malice comes into play in two ways: to rebut circumstances supporting a privilege and/or to support the existence of punitive damages.  In Allington, the court stated:

> We recognize that malice will be presumed if the disparagement of title to real property is false, causes damage, and is not privileged. [ ] The presumption of malice, however, can be overcome by the showing of privilege. [ ] A showing of privilege rebuts the presumption of malice and the plaintiff must then prove actual malice in order to recover in a slander of title action.  [ ] The affirmative defense of good faith raises a privilege and creates a factual issue as to the existence of malice.

Allington Towers Condo. N., Inc. v. Allington Towers N., Inc., 415 So. 2d 118, 119 (Fla. 4th DCA 1982) (internal citations omitted). See also Residential Cmtys. of Am. v. Escondido Cmty. Ass'n, 645 So. 2d 149, 150 (Fla. 5th DCA 1994) ("If a defendant establishes a defense of good faith, or other privilege, however, a plaintiff must prove actual malice."); McAllister, 981 So. 2d at 573-74 ("Even if these factors are met, if an affirmative defense of privilege is raised, the burden shifts to the plaintiff to prove actual malice in order to recover.)

Additional legal conclusions are discussed below in order to resolve specific issues.

### III. Application of Law to Facts of the Case

The parties agreed to facts which establish that the Court has subject matter jurisdiction over this case. (Doc. #138, ¶¶ 1, 10(1).) The Court agrees it has subject matter jurisdiction. (Doc. #127.)

The parties also agree that the Court has personal jurisdiction over defendant, that venue is proper in the Fort Myers Division of the Middle District of Florida, and that Florida substantive law applies (Doc. #138, ¶ 10(1), (2).) The Court agrees with all three propositions.

In Florida, the Clerk of the Circuit Court is the recorder of all instruments that are required or authorized by law to be recorded. Fla. Stat. § 28.222(1). The Clerk must record all instruments in one general series called "Official Records." Fla. Stat. § 28.222(2). The Clerk "shall record" certain kinds of instruments, including in relevant part:

> (a) Deeds, leases, bills of sale, agreements, mortgages, notices or claims of lien, notices of levy, tax warrants, tax executions, and other instruments relating to the ownership, transfer, or encumbrance of or claims against real or personal property or any interest in it; extensions, assignments, releases, cancellations, or satisfactions of mortgages and liens; and powers of attorney relating to any of the instruments.

(b) Notices of lis pendens, including notices of an action pending in a United States court having jurisdiction in this state.

. . .

(f) Certified copies of petitions, with schedules omitted, commencing proceedings under the Bankruptcy Act1 of the United States, decrees of adjudication in the proceedings, and orders approving the bonds of trustees appointed in the proceedings

. . .

(h) Any other instruments required or authorized by law to be recorded.

Fla. Stat. § 28.222.

Several relevant documents were recorded in the Official Records of Collier County, Florida, during the relevant ten year period leading up to the instant lawsuit. The highlighted documents are the ones asserted by plaintiffs as having slandered their title in the Property.

| Date | Description of Document Recorded | Recorded By |
|------|----------------------------------|-------------|
| September 24, 2004 | Oregon General Judgment and Money Award | Epic Aviation |
| October 25, 2007 | Trustee's lien on Property resulting from Mediated Settlement Agreement | Trustee |
| August 23, 2012 | General Judgment and Money Award (re-recording) | Epic Aviation |
| October 10, 2012 | Satisfaction of Trustee's Lien on Property | Trustee |
| **October 12, 2012** | **Notice of Appeal from Order granting Debtors' Emergency Motion for Enlargement of Time to Make Settlement** | **Epic Aviation** |

|  | Payment to the Trustee and for Order Authorizing Sale of the Debtors' Homestead Property (the Auction Order) |  |
|---|---|---|
| **October 12, 2012** | **Notice of Lis Pendens (regarding Auction Order)** | **Epic Aviation** |
| October 30, 2012 | Satisfaction and Release of Lien and Interest | Trustee |
| **November 14, 2012** | **Notice of Appeal from Order Granting Motion to Dissolve Lis Pendens (the Lis Pendens Dissolution Order)** | **Epic Aviation** |
| September 23, 2014 | Affidavit with Oregon General Judgment and Money Award (re-recording) | Epic Aviation |

The Court addresses the elements of slander of title as they relate to each of the pertinent documents:

**(1)  Publication To Third Party**

In a slander of title action plaintiff must prove that defendant published the alleged defamatory statement to a third party, not to an interested party.  Tishman-Speyer Equitable S. Fla. Venture v. Knight Invs., Inc., 591 So. 2d 213, 214 (Fla. 4th DCA 1991); Residential Cmtys. of Am. v. Escondido Cmty. Assn., 645 So. 2d at 150.  Recording a document in the county's Official Records means that it is "always be open to the public . . . for the purpose of inspection thereof and of making extracts."  Fla. Stat. § 28.222(7).  In addition to creating a marketable title record, one of the purposes of recording in the Official Records is to give notice to third parties.  Desak v. VanLandingham, 98

So. 3d 710, 713 (Fla. 1st DCA 2002).   Additionally, the evidence in this case shows actual notice of the recordings to actual third parties, including potential purchasers and their professional associates and a title company.

The Court finds that the recording of each of the three documents in the Official Records satisfies the publication requirement in this case.   <u>McAllister</u>, 981 So. 2d at 574.[9] Defendant does not dispute that plaintiffs have satisfied the publication element for each document.   (Doc. #138, p. 4) ("Epic recorded the lis pendens during the course of a judicial proceeding").

**(2)  Falsehood**

Plaintiffs must establish that the offending recorded document was in fact false.   <u>McDonald v. McGowan</u>, 402 So. 2d 1197, 1200 (Fla. 5th DCA 1981).   The falsehood element requires a showing that any alleged falsity in the recorded document was substantive in nature, not procedural.   Thus, recording a document which is

---

[9] <u>Tishman-Speyer Equitable S. Florida Venture v. Knight Investments, Inc.</u> stated:  "Nor does actionable publication occur when a lis pendens is recorded.  <u>See Procacci v. Zacco</u>, 402 So. 2d 425 (Fla. 4th DCA 1981)."   591 So. 2d 213, 214 (Fla. 4th DCA 1991).   This dicta is simply an overbroad statement as to the holding of <u>Procacci</u>, which relied upon the affirmative defense of litigation privilege under the facts of that case.

not entitled to be recorded is not alone sufficient. <u>Ridgewood Utilities Corp. v. King</u>, 426 So. 2d 49, 50 (Fla. 2d DCA 1982). Plaintiff must still establish that the document was false. <u>Id.</u> "[A] distinction must be drawn between an improper filing in a procedural sense, and a wrongful filing in a substantive sense. Only the latter will support an action for disparagement of property because only it meets the requisite falsehood element of the action." <u>Bothmann v. Harrington</u>, 458 So. 2d at 1168. While a trial court is permitted to consider such a wrongfully filed document, <u>Medellin v. MLA Consulting, Inc.</u>, 69 So. 3d 372, 374 (Fla. 5th DCA 2011), a statement predicated on a mistaken belief is not necessarily false or malicious, <u>Brown v. Kelly</u>, 545 So. 2d 518, 520 (Fla. 5th DCA 1989).

**(a)   Notices of Appeal Recorded in Official Records**

The first document which plaintiffs claim constituted a slander of their title to the Property was the Notice of Appeal of the Auction Order, recorded on October 12, 2012, which contained a copy of the Auction Order which was the subject of the appeal. Plaintiffs' Exhibit 5. The third document which plaintiffs claim constituted slander of their title to the Property was the Notice of Appeal of the Lis Pendens Dissolution Order, recorded on November 14, 2012. Plaintiffs' Exhibit 8. A copy of the Dissolution Order was attached to this Notice of Appeal.

In general, the <u>filing</u> of a Notice of Appeal is the mechanism by which a party seeks review by an appellate court of a final decision by a lower court which appellant asserts was erroneous. A Notice of Appeal has jurisdictional consequences on the court receiving the notice and the court from which the appeal is taken. <u>In re Robinson</u>, 640 F.2d 737, 738 (5th Cir. Unit A Mar. 1981). The Notice of Appeal is a simple document which must identify the parties and the order, judgment or decree being appealed, and be accompanied by a copy of the judgment, order or decree being appealed. Fed. R. Bankr. P. 8003(a)(3). A Notice of Appeal is not required to set forth the reasons for the appeal or the arguments which support appellant's position. The only substantive inference possible from a Notice of Appeal is that the appealing party is challenging the validity of the order or judgment from which the appeal is taken.

The recorded Notices of Appeal at issue contained no false statements. The Notices of Appeal stated that Epic Aviation was appealing certain orders, and attached a copy of the order being appealed, as required by the Bankruptcy Rule. While there was conflicting testimony as to whether recording such notices of appeal in the Official Records was proper, even an improper recording would not alone satisfy the falsity element. The Notices of Appeal were literally true: Epic Aviation was

appealing those orders, and indeed pursued such appeals to conclusion.  While Epic Aviation lost those appeals, losing does not convert the notices into documents which contain a substantive falsehood.  The Court finds that plaintiffs have not satisfied the falsity element as to the first and third documents, i.e., the recorded Notices of Appeal.

**(b)  Notice of Lis Pendens Recorded in Official Records**

The second document, which plaintiffs claim constituted a slander of their title to the Property, was the Notice of Lis Pendens regarding the Auction Order, also recorded on October 12, 2012.  Plaintiffs' Exhibit 6; Defendant's Exhibit 56.  The Notice of Lis Pendens bore the caption and case numbers of the Bankruptcy Court cases, and stated that "Epic Aviation, LLC, an Oregon limited liability company, has initiated this action to preserve its interests and rights under its appeal of that certain Order on Debtors' Emergency Motion for Enlargement of Time to Make Settlement Payment to the Trustee and For Order Authorizing Sale of the Debtors' Homestead Property, with respect to the property described in below: [setting forth legal description of the Property]."  Id.  The Court finds that this recorded document was knowingly and intentionally false.

"The lis pendens mechanism is not designed to aid either side in a dispute. . . ."  Centerstate Bank Cent. Fla., N.A. v. Krause,

87 So. 3d 25, 28 (Fla. 5th DCA 2012).  As was recently stated by

<u>J.B.J. Inv. of S. Fla., Inc. v. Maslanka</u>, 163 So. 3d 726, 728 (Fla.

5th DCA 2015):

> The term "lis pendens" is defined as the
> jurisdiction, power, or control that courts
> acquire over property involved in a pending
> suit. A notice of lis pendens serves two major
> purposes. First, a recorded lis pendens acts
> to warn future purchasers or encumbrancers
> that a suit is pending that could affect title
> in a given piece of property. This is because
> one who purchases property subject to a lis
> pendens is bound by the judgment or decree
> rendered against the party from whom he makes
> the purchases as much so as though he had been
> a party to the judgment or decree himself.
> Second, the filing of a lis pendens is
> designed to protect a plaintiff from
> intervening liens that could impair or
> extinguish that plaintiff's claimed property
> rights. In short, a lis pendens exists as much
> to warn third parties as to protect the
> plaintiff.

(citations and internal punctuation omitted).  A lis pendens is a

harsh and oppressive remedy because it operates as a cloud on the

title and effectively prevents an owner from selling the property.

<u>Avalon Assocs. of Delaware Ltd. v. Avalon Park Assocs., Inc.</u>, 760

So. 2d 1132, 1134 (Fla. 5th DCA 2000).  "Under Florida law, a lis

pendens is proper only when the required relief might specifically

affect the property in question.  There is no other justification

for burdening the alienability of property pending the outcome of

a lawsuit."  <u>Ross v. Breder</u>, 528 So. 2d 64, 65 (Fla. 3d DCA 1988)

(quoting Beefy King Int'l, Inc. v. Veigle, 464 F.2d 1102 (5th Cir. 1972)).

The Notice of Lis Pendens contained false statements. First, it falsely stated that Epic Aviation "has initiated this action" given the Bankruptcy Court case number. Epic Aviation did not initiate the bankruptcy action; rather the Debtors did. While Epic Aviation initiated the appeal, that is not what the Notice of Lis Pendens states. More importantly, by recording the Notice of Lis Pendens in the Official Records of Collier County, Epic Aviation was as a matter of law attesting that the results of its appeal of the Auction Order might specifically affect the Property. This was a material false statement.

The Court finds: Epic Aviation never had an ownership or lien interest in the Property, which was owned by the Debtors by the entireties at all relevant times. Epic Aviation knew this from the beginning of the bankruptcy litigation through its conclusion. Epic Aviation knew the Property was not subject to its Judgment against Scott Phillips. Epic Aviation persistently attempted to reach the Property to collect on its Judgment despite knowing the Property was not subject to its Judgment against Scott Phillips. Epic Aviation started by seeking to compel the sale of the Property to satisfy its Judgment, then shifted to taking frivolous appeals intended to delay the actual sale of the Property

by Debtors.  Epic Aviation filed the Notice of Lis Pendens, as well as the Notices of Appeal, in an effort to coerce the Debtors to allow Epic Aviation to reach an asset which it had no legal right to reach to satisfy its judgment against Scott Phillips individually.  Epic Aviation never intended to act in the benefit of the other creditors, and never did so.  Epic Aviation intentionally filed the Notice of Lis Pendens not because it believed in the merits of its inaccurate legal theory, but as a strategy to prevent Debtors from selling the Property.  Even if Epic Aviation would have prevailed on its appeal of the Auction Order, Epic Aviation would not have had any interest in the Property.  Claiming that success in its appeal would result in an interest in the Property was knowingly false.

### (3) Knowledge of Likelihood Result of Inducing Others Not to Deal with Plaintiffs

In a slander of title action, plaintiff must prove that the defendant-publisher knew or reasonably should have known at the time of publication that the publication would likely result in inducing others not to deal with the plaintiff, and that in fact the falsehood did play a material and substantial part in inducing others not to deal with plaintiff.  Bothmann v. Harrington, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984).  The Court finds ample evidence to satisfy these elements as to the Notice of Lis Pendens.

Even before Epic Aviation knew of an actual sales contract for the Property, it knew that recording a document in the Official Records was notice to the world.  Epic Aviation knew such a recording would be a cloud on the Property's title to reasonable purchasers, which is exactly what Epic Aviation intended.  When Epic Aviation learned of the sales contract for the Property by Debtors to Mr. Morrissy, its intent to preclude a sale of the Property became specific as to that contract.  Epic Aviation intended to prevent the sale by Debtors to Mr. Morrissy and to Mr. Connors.  The evidence established that both were bona fide, good faith purchasers willing and able to purchase the Property, and that the contracts would have closed but for the obstructive efforts of Epic Aviation.

**(4) Material and Substantial Part in Inducing Others Not to Deal with Plaintiffs**

The Court also finds ample evidence that the recording of the Notice of Lis Pendens was indeed a material and substantial part of inducing others not to purchase the Property.  Emails, correspondence, and discussions by Mr. Morrissy and his real estate professionals establish that Epic Aviation's stubborn refusal to let go of a frivolous legal position and its recording of the false Notice of Lis Pendens caused the Morrissy contracts to fail to close.  The Connors contract fell through for similar reasons.

**(5)  Malice**

Because defendant has asserted an affirmative defense of privilege, plaintiffs must prove actual malice.  The Court finds that they have done so.

There is no doubt in the Court's mind from the evidence that Epic Aviation acted in bad faith and with actual malice in many of its actions, including the recording of the Notice of Lis Pendens. Despite the testimony and argument to the contrary, which the Court found not to be credible, Epic Aviation was driven not by a desire to stand in the shoes of the Trustee, or even, in the end, to act in its own financial best interest.  Instead, Epic Aviation acted out of spite based upon ill-will and mean-spiritedness toward Scott Phillips developed over the course of their contentious litigation.  Its actions, including recording the Notice of Lis Pendens and its refusal to withdraw that recording, were malicious.

**(6)  Damages and Special Damages**

Damages are an element of a slander of title action, <u>Donald M. Patterson, Inc. v. Bonda</u>, 425 So. 2d 206 (Fla. 4th DCA 1983), and therefore plaintiffs must prove they incurred damages attributable to the Notice of Lis Pendens.  <u>Levin v. Lang</u>, 994 So. 2d 445, 446 (Fla. 3d DCA 2008).

In a slander of title action, "the pecuniary loss recoverable for the injurious falsehood is restricted to that which results

directly and immediately from the falsehood's effect on the conduct of third persons and the expenses incurred to counteract the publication." Bothmann, 458 So.2d at 1170. "[T]he proper method of measuring damages for wrongful filing of lis pendens is the difference between the fair market value at the time of the filing of the lis pendens and the fair market value at [the] time of its termination, plus any consequential damages, including attorney's fees." FCD Dev., LLC v. S. Fla. Sports Comm'n, Inc., 37 So. 3d 905, 909 (Fla. 4th DCA 2010) (quoting S & T Builders v. Globe Props., Inc., 909 So.2d 375, 376 (Fla. 4th DCA 2005)).

Consequential damages include expenses incurred in the ownership, preservation, and operation of the property which are the natural consequence of the wrongful lis pendens while it is outstanding. Haisfield v. APC Fla. Holdings, Inc., 668 So. 2d 1049, 1050 (Fla. 4th DCA 1996). See also Price v. Tyler, 890 So. 2d 246, 249-50 (Fla. 2004); Jenkins v. Plaza 3000, Inc., 134 So. 3d 1127, 1131 (Fla. 4th DCA 2014). "In order to sustain a claim for consequential damages arising out of wrongful lis pendens, a wronged seller must show a diligent yet unsuccessful attempt to resell the property after the buyer breached the agreement." Haisfield v. ACP Fla. Holdings, Inc., 629 So. 2d 963, 966 (Fla. 4th DCA 1993) (citation omitted). The trial judge considers the intent of the seller to sell property, the seller's efforts to

effect a sale, and effect of notice of lis pendens upon the seller's resale attempts.  Haisfield, 629 So. 2d at 966.

Here, plaintiffs do not seek direct damages because the Property eventually sold for more than its fair market value at the time the Notice of Lis Pendens was recorded.  The Property ultimately sold for $4.9 million, which was in excess of the fair market value when the Notice of Lis Pendens was wrongfully recorded.  Therefore, plaintiffs are not entitled to direct damages from the wrongful conduct of Epic Aviation.

Plaintiffs do seek consequential damages and attorney fees, which they have listed in Plaintiffs' Exhibits 46 and 47.  The process for determining if such damages are available and, if so, the amount, is set forth in Haisfield, 668 So. 2d at 1049–50[10].

The Court makes the following relevant findings:

(1)   The Notice of Lis Pendens was recorded on October 12, 2012, and was in effect until September 24, 2014, when it was terminated by the Eleventh Circuit Court of Appeals' decision which upheld the District Court and

---

[10] The Court considers whether the property declined in value or increased in value, and if the property was being run at a net operating gain or a net operating loss to determine consequential damages.

Bankruptcy Court rulings.  <u>Haisfield</u>, 629 So. 2d at 966 n.1.

(2) The fair market value of the Property at that time of the recording of the Notice of Lis Pendens was between $4.325 million (the price of the Morrissy purchase agreement signed July 23, 2012), and $4.315 million (the price of the second Morrissy purchase agreement signed November 19, 2012).  Given the closer time proximity, the Court concludes that the fair market value on October 12, 2012, was **$4.315 million**.  The Court rejects the opinion of Halas Neal Scott, the expert for Epic Aviation, who valued the Property at $4.25 million as of October 12, 2012, using the comparable sales methodology.

(3) The fair market value of the Property on September 24, 2014 when the Notice of Lis Pendens terminated was **$4.4 million**, the price of the Connors Sale Contract signed on June 16-17, 2014.

(4) The Property sold about a year later, on November 2, 2015, for $4.9 million.

Thus, the Property value increased from $4.315 million to $4.4 million, a positive difference of **$85,000.**

Since the Property increased in value while the wrongful Notice of Lis Pendens was outstanding, the Court must determine the amount of the consequential damages, i.e., the necessary expenses incurred in the ownership, preservation, and operation of the property which are the natural consequence of the wrongful lis pendens while it is outstanding.  Under Florida law, plaintiffs can only recover an amount of consequential damages which exceed the $85,000 increase in the value of their Property.  Haisfield, 668 So. 2d at 1049-50.

The Court finds that plaintiffs have shown multiple, diligent, but unsuccessful attempts to sell the Property, including after Epic Aviation wrongfully recorded the Notice of Lis Pendens.  It is clear that at least by that time plaintiffs were motivated to sell the Property, and were making good faith efforts to do so.  Plaintiffs through their attorneys worked diligently to counteract the adverse effects of the wrongfully filed Notice of Lis Pendens, which prevented the sale of the Property.

In addressing the claimed consequential damages, the Court follows the chart provided by plaintiffs as Plaintiffs' Exhibit 47 (As of 10/22/2015 - Revised 12/7/2015):

(1) **Association Dues**:  The Court finds that nine months of dues for 2014 are recoverable, but not the dues which

post-date the termination of the Notice of Lis Pendens. Therefore, **$296.25** will be allowed.

(2) **Renovations:** All of these are capital improvements, and are not necessary expenses incurred in the ownership, preservation, or operation of the Property which are the natural consequence of the wrongful lis pendens while it is outstanding. The Court allows none of these renovations as consequential damages.

(3) **Maintenance:** Plaintiffs seek $51,724.70 [11] in this category. The Court eliminates those expenses which pre-date the recording of the Notice of Lis Pendens (October 12, 2012) and those which post-date the termination of the Notice of Lis Pendens (September 24, 2014). The Court allows the remaining expenses, which total **$34,232.20.**

(4) **Homeowner Insurance:** The Court allows the amounts for the period in which the Notice of Lis Pendens was outstanding. Thus, the Court allows the $7,380.17, the $21,763.39, and six months of the QBE Specialty Insurance Co. through September 2014. The Court does

---

[11] The Court's total of the listed invoices is $52,487.20, after deducting $762.50 in credits.

not allow any of the insurance after September 24, 2014, when the Notice of Lis Pendens terminated. Thus, the Court allows **$39,360.28** for homeowners insurance.

(5) **Other Insurance:**  The Court allows the insurance premiums for Hartford Insurance Co. of the Midwest and Lutgert Insurance (FEMA) through the termination of the Notice of Lis Pendens, which total **$2,700.80** ($460.80 plus $1,387.00 plus seven months of the FEMA insurance in the amount of $853.00).

(6) **Interest on Home Equity Line of Credit:**  The Court allows the interest on the home equity line of credit through the termination of the Notice of Lis Pendens, which totals **$29,744.99**.

(7) **Mortgage Interest**:  The Court allows the interest on the mortgage through the termination of the Notice of Lis Pendens, which totals **$132,309.80**.

(8) **Pool Service:**  The Court allows the pool service expense, all of which occurred during the relevant time period, and which totals **$2,520.00**.

(9) **Property Tax:**  The Court allows property tax for 2012 and 2013, but not for 2015.  The amount allowed totals **$29,834.19**.

(10) **Utilities:**  All of the requested water expenses (City of Naples) are within the relevant time period, and total $3,146.09.  The only gas (Balgas) invoice is for 2015, and is disallowed.  The electricity (FPL) invoices are all within the relevant time period and total $5,685.78.  Therefore, the total allowable utilities is **$8,831.87**.

(11) **Other:**  The Court is not convinced that the $120.00 to hang mirrors and art is a necessary expense to maintain or preserve the Property.  It will not be allowed.

(12) **Total:**  The Court finds that plaintiffs have established that a total of **$279,830.38** was expended as necessary expenses incurred in the ownership, preservation, and operation of the property, which were the natural consequence of the wrongful lis pendens while it was outstanding.

The final step in the calculation of the consequential damages is to deduct the amount of the increase in property value from the necessary expenses.  The total allowed expenses is $279,830.38, and the amount of the property value increase is $85,000.  This results in net recoverable expenses of **$194,830.38**.

Plaintiffs also request attorney fees. Plaintiffs' Exhibit 46.  Plaintiffs seek **$47,147.50** for 123.8 hours related to the dissolution of the lis pendens and the proceedings before the

District Court and the Court of Appeals.  The Court rejects Epic Aviation's argument that appellate fees are not compensable.

The Court is deeply familiar with this litigation, and the attorneys involved.  After reviewing Plaintiffs' Exhibit 46 and the record of the case, the Court is satisfied that the number of hours expended, the total fee, and the average hourly fee are reasonable given the nature and extent of this litigation.

Epic Aviation argues that plaintiffs should be denied their special damages as a sanction for committing fraud on the Court. The Court declines to do so.  There is no reason, particularly given the facts in this case, why Epic Aviation should have the amount of damages it owes reduced because of Scott Phillips's conduct towards the Court.

## IV.   *Affirmative Defenses*

### A. Florida Litigation and Appellate Litigation Privilege

Defendant raises the affirmative defense of privilege pursuant to the Florida litigation privilege and the Florida appellate litigation privilege.  The history of the litigation privilege in Florida has been summarized as follows:

> The litigation privilege was first recognized in Florida in 1907 to provide legal immunity for actions that occur in judicial proceedings.  Myers v. Hodges, 53 Fla. 197, 44 So. 357 (1907). In Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co., 639 So. 2d 606, 608 (Fla. 1994),

the Florida Supreme Court extended the
litigation privilege, already applicable to
defamatory statements (slander and libel) and
perjury, to all other torts so long as the act
complained of occurs during and has some
relation to the proceedings, stating: [W]e
find that absolute immunity must be afforded
to any act occurring during the course of a
judicial proceeding, regardless of whether the
act involves a defamatory statement or other
tortious behavior such as the alleged
misconduct at issue, so long as the act has
some relation to the proceeding. . . .
[P]articipants [must] be free to use their
best judgment in prosecuting or defending a
lawsuit without fear of having to defend their
actions in a subsequent civil action for
misconduct. The Levin plaintiff alleged that
the defendant law firm tortiously interfered
with the plaintiff's relationship with its
attorneys by listing the attorneys as
witnesses in a separate case in order to
prevent them from serving as attorneys in that
case. Id. at 607. The Levin court held the
attorneys' conduct was shielded against the
plaintiff's suit by Florida's litigation
privilege. Id.

Thirteen years after Levin, the Florida
Supreme Court clarified that "[t]he litigation
privilege applies across the board to actions
in Florida, both to common-law causes of
action, those initiated pursuant to a statute,
or of some other origin," Echevarria, McCalla,
Raymer, Barrett & Frappier v. Cole, 950 So. 2d
380, 384 (Fla. 2007), and reaffirmed that
"[a]bsolute immunity must be afforded to any
act occurring during the course of a judicial
proceeding ... so long as the act has some
relation to the proceeding." Echevarria, 950
So. 2d at 384 (quoting Levin, 639 So. 2d at
608), see also DelMonico v. Traynor, 116 So.
3d 1205 (Fla. 2013) (clarifying that, although
not all statements made outside of the formal
judicial process are protected by the

litigation privilege, an absolute privilege
applies to conduct occurring during the course
of the proceedings).

Wolfe v. Foreman, 128 So. 3d 67, 68-69 (Fla. 3d DCA 2013).

Florida's litigation privilege applies to slander of title cases.

Sailboat Key, Inc. v. Gardner, 378 So. 2d 47 (Fla. 3d DCA 1980);

Procacci v. Zacco, 402 So. 2d 425 (Fla. 4th DCA 1981).

There are certainly factual situations when recording a
notice of lis pendens is a privileged act.   E.g., Procacci v.
Zacco, 402 So. 2d 425 (Fla. 4th DCA 1981); Palmer v. Shelby Plaza
Motel, Inc., 443 So. 2d 285 (Fla. 2d DCA 1983); Fernandez v. Haber
& Ganguzza, LLP, 30 So. 3d 644 (Fla. 3rd DCA 2010).   In other
factual contexts, it is not.   Atkinson v. Fundaro, 400 So. 2d
1324, 1326 (Fla. 4th DCA 1981) ("filing of the lis pendens was not
privileged since it was neither a proper notice of lis pendens nor
did it involve the property in litigation."). In the current case,
the filing of the Notice of Lis Pends fell outside the Florida
litigation privilege.   The notice of lis pendens advising the
public of the appeal of the auction order did not relate to
property which would have been affected by a reversal of the
Auction Order.   The appeal related to the Settlement Agreement.
The Property was not at issue, and would not have been impacted,
except by future litigation asserting frivolous arguments.

## B. Waiver of Claim By Plaintiffs

Epic Aviation claims that plaintiffs have waived their claim of slander of title by failing to pursue the statutory remedy of asking the court to require the posting of a bond pursuant to Fla. Stat. § 48.23(3). (Doc. #68, Second Affirmative Defense). Florida does not require that a plaintiff request a bond as a pre-condition for bringing a slander of title suit, and the evidence amply establishes that plaintiffs did not waive their right to bring suit.

## C. Election of Remedies

Epic Aviation asserts that plaintiffs cannot bring a claim for slander of title because they elected to file a motion to dissolve the lis pendens but failed to seek the posting of a statutory bond pursuant to Fla. Stat. § 48.23(3). Epic Aviation asserts that damages are not available in the absence of a bond. (Doc. #68, Third Affirmative Defense.) The Court rejects this argument. Florida law does not condition a slander of title suit on seeking or obtaining a bond.

Accordingly, it is hereby

**ORDERED:**

1. Count II of the Third Amended Complaint is dismissed with prejudice.

2.  As to Count I of the Third Amended Complaint, pursuant to a bench trial, judgment is entered in favor of Bonita B. Phillips and Jeffrey S. Phillips and against Epic Aviation, LLC, an Oregon corporation, in the amount of $194,830.38 for consequential damages plus $47,147.50 for attorney fees, for a total of $241,977.88.  Judgment shall enter accordingly.

3. The Clerk shall close the case.

**DONE and ORDERED** at Fort Myers, Florida, this   18th   day of January, 2017.


_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:
Counsel of Record